William F. ZINGER, Appellant,

v.

Robert W. BLANCHETTE et al., Appellees.

No. 76–1249.

United States Court of Appeals,
Third Circuit.

Argued Oct. 8, 1976.

Decided Jan. 20, 1977.

Alexander Brodsky, Harry E. Brodsky, Brodsky, Brodsky & Brodsky, Philadelphia, Pa., for appellant.

Hermon M. Wells, Philadelphia, Pa., for appellees.

Before ADAMS, KALODNER * and WEIS, Circuit Judges.

OPINION OF THE COURT

WEIS, Circuit Judge.

Acknowledging the inexorable march of time but unwilling to leave his employment before the customary age of 65, the plaintiff contests his involuntary retirement one year earlier. He contends that an agreement by his employer preceding the formation of the Penn Central Railroad and the Age Discrimination in Employment Act both proscribe his premature retirement. Consequently, he seeks to augment his pension to what it would have been had he remained in service until he reached 65. Though he argues vigorously, we conclude that he cannot prevail on either of his con-

---

* Although Judge Kalodner was not present at oral argument, counsel, by consent, agreed to his participation in the decision and Judge Kalodner reviewed the record of oral argument.

tentions and, therefore, we must affirm the district court's judgment for the defendants.

Only months before his sixty-fifth birthday and despite his protests, the Penn Central Transportation Company retired plaintiff Zinger, making him eligible for pension benefits from several sources, including the Railroad Retirement Fund. However, these payments total $834.12 less per year than he would have received had he continued to work for Penn Central until age 65.

Zinger began working for the Pennsylvania Railroad Company in 1943, and continued without interruption in the service of its successor, the Penn Central. He served as an attorney in the legal department of the company on a salary basis, and appeared for the railroad in proceedings in the courts as well as before the Interstate Commerce Commission. His efforts were directed chiefly toward claims for freight loss and damage, and did not extend to matters of company policy or the discretion to institute litigation.

Zinger had been a contributing member of the Plan for Supplemental Pensions first put into effect by the Pennsylvania Railroad in 1938 and later amended by the Penn Central in 1974.[1] The Plan provided for payment of pension benefits in addition to those afforded by the Railroad Retirement Act. In 1962, the Pennsylvania Railroad also adopted an "Interim Pension Policy" to pay benefits to those employees retiring before 65, when payments began under the Railroad Retirement Act.

In the preliminary negotiations for the Pennsylvania and New York Central merg-

er, management agreed with the unions to provide extensive job protection for their members. In the course of ICC hearings, concerned in part with the fate of employees who would be affected by the merger, the companies stated that they would extend those benefits to non-union ("non-agreement") personnel as well. The Commission approved the protective agreement as "fair and equitable" to both union and "non-agreement" employees but required the latter group to accept the terms and conditions of the agreement in writing.[2]

On April 5, 1965, the chairman of the board of the Pennsylvania Railroad sent a letter addressed to "PRR Supervisors, Managers, and Officers" explaining some effects of the merger. Mr. Zinger was one of the persons who received this communication. In the body of the letter, the chairman wrote:

"You will note from Section I, [of the attachment] which applies to you, that non-agreement supervisors, managers, and officers will be offered continued employment until they retire, . . . ."

The attached document, captioned "Personnel Policy for Merger of the Pennsylvania and New York Central Railroads Applying to Supervisors, Managers, Officers and other Employees Not Subject to Agreement with Unions,"[3] listed two classifications of personnel not subject to the union agreement: "I. Supervisors, Managers, and Officers" and "II. Other Employees Not Subject to Agreements with Unions." Paragraph E under the first category read:

"The company may elect to retire any such person between ages 60 and 65 and

1. After the merger with the New York Central Railroad, plaintiff was no longer required to make contributions to the fund.

2. See Pennsylvania Railroad Company-Merger-New York Central Railroad Company, 327 ICC 475, 544–545. The record does not disclose whether the acceptance in writing condition was enforced.

3. There is some confusion about this exhibit in the record. The plaintiff's proposed findings of fact rely upon a different attachment, and the district court did not clarify the situation when

it made its findings of fact. In his post-trial brief in the district court, the plaintiff said, "Plaintiff is therefore basing his case on the printed statement which defendants claim was or should have been attached." We rely upon the contents of the exhibit as reprinted in the appendix filed in this case at page 102a. This version is the one that defendant asserts to be the proper attachment and the one to which plaintiff refers in his brief at pages 20–25.

he, as well as any such person over 60 years of age who is unwilling to relocate or accept a position in a new field of endeavor, will be provided interim pension allowances . . . ."

On February 19, 1968, soon after consummation of the Penn Central merger, the senior vice president sent a letter to "Management Employees Provided For by The Personnel Policy for Merger of the Pennsylvania and New York Central Railroads." This letter, sent to Mr. Zinger among others, stated in part: "[I]t is a pleasure to reaffirm the Personnel Policy for Merger which applies to you." The policy was reprinted on the reverse side and read in part: "[T]hese policies will apply to managers and officers not subject to the provisions of the ICC Order." Included was a provision for early retirement at the company's election set out in the same verbiage as in the letter of April 5, 1965.

On March 1, 1974, the general counsel for Penn Central told plaintiff that he would be retired very shortly. After Zinger protested and commenced this litigation, his retirement was postponed to October 1, 1974, seven months before his 65th birthday.

In the district court, plaintiff asked for injunctive relief and damages, asserting that as a "non-agreement employee" he could not be involuntarily retired. In addition, he alleged that the early retirement plan violated the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.* The district court rejected both contentions, and entered judgment for the defendants.

## I.

Plaintiff's position, as we understand it, is that, as a salaried employee of the railroad, he was entitled to the benefits of the protective agreement approved by the ICC as a condition of the merger. He argues that since the ICC is required to protect the interests of all affected railroad employees in the event of a merger, *see* 49 U.S.C. § 5(2)(f), and "employee" is not defined in the statute, the word should be given its ordinary meaning—one that would include a person in his position. In response, the defendants argue that managers and professional personnel are simply not "employees" within the meaning of § 5(2)(f) and there was no intention to include them in the protective agreement.

Before reaching the question of whether plaintiff was covered by the protective agreement, however, we think it important to determine whether its provisions have the effect Mr. Zinger urges. We conclude that they do not.

The plaintiff cites language in the union protective agreement of May 20, 1964 providing that, upon merger, employees of the Pennsylvania Railroad shall be continued in service "and none of the present employees . . . shall be deprived of employment or placed in a worse position with respect to compensation, rules, working conditions, fringe benefits or rights and privileges pertaining thereto at any time during such employment." Mr. Zinger apparently contends that the company's action in retiring him before age 65 was a deprivation of employment. However, the agreement states, "[a]n employee shall not be regarded as deprived of employment or placed in a worse position . . . in case of his . . . retirement . . . ."

The plaintiff also points to a factual stipulation that "[e]mployees subject to the Union Contract dated May 20, 1964, have not involuntarily been retired early by the Penn Central Transportation Company." That fact, however, does not of itself establish a contractual undertaking under the terms of the protective agreement. All that the record shows is that the ICC order and the offer of the railroads were limited to the terms of the May 20, 1964 writing. There was no understanding that unspecified provisions of other union collective bargaining agreements or practices would be incorporated and applied to non-union employees.

After a careful review of the evidence, we find nothing to show that the protective agreement, even if it covers plaintiff, prohibits the early retirement on a pension otherwise permitted by company policy.

Since he has failed to prove any breach of the protective agreement, we need not decide whether the plaintiff would be considered an "employee" within the terms of the statute or the ICC order. We doubt that he would on the record here because of the lack of evidence to establish the meaning which the railroads and the ICC placed upon the word in their negotiations. Our research and that of counsel has not uncovered any authoritative court decision or ruling of the ICC in which a person in Mr. Zinger's capacity has been considered an "employee" under § 5(2)(f) of the Interstate Commerce Act. Accordingly, we would expect discussion and a specific designation in the proceeding and order if such an unusual result were desired.[4] What evidence there is in this case tends to show an intention to exclude, but since the record is not as complete as it might be, we think it better practice not to issue a definitive ruling. Accordingly, since the record does not demonstrate a breach of the protective agreement, the plaintiff has failed to meet the burden of proof on that issue, and the district court's finding in favor of the defendants was not erroneous.

## II.

Disposition of the protective agreement issue, however, does not end the case. As an alternative, Zinger contends that the Penn Central program authorizing involuntary retirement between the ages of 60 and 65 violates the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.* He asserts that the early retirement provision, although bona fide, is a "subterfuge" and, hence, not within the exception described in 29 U.S.C. § 623(f):

4. In *Norfolk v. W. Railway Co. and New York C & STLR Company Merger,* 330 ICC 780 (1967), the Commission stated:

"We deny the requests of D & H and B & M to extend employee protection to their supervisory, professional and executive personnel. The term 'employee' is not defined in the Interstate Commerce Act.

\* \* \* \* \* \*

"[T]he record is silent with respect to the cost of protection if it were extended to supervisory, professional and executive personnel. Absent evidence of the effect of this

"It shall not be unlawful for an employer, employment agency, or labor organization—

\* \* \* \* \* \*

"(2) to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purpose of this Act, except that no such employee benefit plan shall excuse the failure to hire any such individual."

The railroad argues that since the early retirement plan predated the Act, it cannot be considered a subterfuge. We believe this chronological argument lacks merit, and the mere fact that the plan was in existence before the Act was passed is not determinative. The statute speaks of evading the *"purposes"* of the Act—not the Act itself. Thus, a seniority practice or employee benefit plan effective long before the enactment of the statute could, nevertheless, be opposed to its purposes and thus be a subterfuge. Further, the legislative history is contrary to defendant's position. The House Report, in discussing this particular clause, states:

"It is important to note that exception (3) [the present (2)] applies to new and existing employee benefit plans, and to both the establishment and maintenance of such plans. This exception serves to emphasize the primary purpose of the bill— hiring of older workers—by permitting employment without necessarily including such workers in employee benefit plans. The specific exception was an amendment to the original bill, is considered vita [sic] to the legislation, and

transaction upon such personnel and of their need for protection, *e. g.,* the transferability of their skills, *Amalgamated Transit Union v. United States,* [D.C.] 253 F.Supp. 481, *aff'd per cur.* 385 U.S. 38 [87 S.Ct. 240, 17 L.Ed.2d 35] (1966), we would not be justified in providing protective conditions for these personnel." 330 ICC at 825, 826.

Though not relevant to a decision on the legal issues, we learned at oral argument that Mr. Zinger was employed by an industry association soon after his retirement by the Penn Central.

was favorably received by witnesses at the hearings." H.R.Rep. No. 805, 90th Cong., 1st Sess. (as found in 1967 U.S. Code Cong. and Admin.News p. 2217) To this extent, we agree with the conclusion of the United States Court of Appeals for the Fourth Circuit in *McMann v. United Air Lines, Inc.,* 542 F.2d 217 (4th Cir. 1976), and, accordingly, reject the defendants' chronological argument. *But see Brennan v. Taft Broadcasting Co.,* 500 F.2d 212 (5th Cir. 1974); *deLoraine v. MEBA Pension Trust,* 499 F.2d 49 (2d Cir.), *cert. denied,* 419 U.S. 1009, 95 S.Ct. 329, 42 L.Ed.2d 284 (1974); *Steiner v. National League of Professional Baseball Clubs,* 377 F.Supp. 945 (C.D.Cal.1974).

Plaintiff's contention is that the Act proscribes involuntary retirement before 65. In a far reaching decision, *McMann v. United Air Lines, Inc., supra,* the Court of Appeals for the Fourth Circuit held that the Act by implication, outlaws all programs providing for involuntary retirement before age 65, whether at the company's option or under mandatory provisions. However, in *Brennan v. Taft Broadcasting Co., supra,* the Fifth Circuit held that a bona fide plan providing benefits upon involuntary retirement at age 60 was not a subterfuge and therefore permissible under the Act.

Confronted with diametrically different interpretations by two highly respected courts, we must independently examine the Act and its legislative history.

29 U.S.C. § 623[5] makes it unlawful to *discharge* an individual because of age. No statutory provision explicitly prohibits early retirement on pension. Only two sections mention "retirement": § 623(f)(2) which exempts observance of a bona fide retirement program; and § 624 which requires the Secretary of Labor to study the institutional arrangements giving rise to involuntary retirement and to report his findings, together with any legislative recommendations, to the President and to Congress.

■ The primary purpose of the Act is to prevent age discrimination in hiring and discharging workers. There is, however, a clear, measurable difference between outright discharge and retirement, a distinction that cannot be overlooked in analyzing the Act. While discharge without compensation is obviously undesirable, retirement on an adequate pension is generally regarded with favor.[6] A careful examination of the legislative history demonstrates that, while cognizant of the disruptive effect retirement may have on individuals, Congress continued to regard retirement plans favorably and chose therefore to legislate only with respect to discharge.

In his message of January 23, 1967, the President recommended legislation covering

---

5. PROHIBITION OF AGE DISCRIMINATION

Sec. 4(a) It shall be unlawful for an employer—

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or

\* \* \* \* \* \*

(f) It shall not be unlawful for an employer

. . . . —

(1) to take any action otherwise prohibited under subsections (a), (b), (c), or (e) of this section where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business, or where the differentiation is based on reasonable factors other than age;

(2) to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this Act, except that no such employee benefit plan shall excuse the failure to hire any individual; or

(3) to discharge or otherwise discipline an individual for good cause.

Act of December 15, 1967, Pub.L. No. 90–202 § 4, 81 Stat. 602, 603–604.

6. *See* generally, Hearings on Early Retirement and Related Subjects Before the Subcomm. on Retirement and the Individual of the Senate Special Comm. on Aging, 90th Cong., 1st Sess., pt. 2 (1967). *Cf.* Mandatory Retirement: The Law, The Courts, and The Broader Social Context, 11 Willamette L.J. 398 (1975).

workers from ages 45 to 64 and "provided an exception for special situations . . . where the employee is separated under a regular retirement system." 113 Cong.Rec., pp. 1089–1090. As referred to committee, both Senate and House Bills provided:

"Sec. 4(f) It shall not be unlawful . .

(2) to separate involuntarily an employee under a retirement policy or system where such policy or system is not merely a subterfuge to evade the purposes of this Act."

Senator Javits recognized that actuarial considerations in the administration of pension plans might hinder employment of older workers. As he said to the Senate subcommittee:

"Now, another problem is the operation of established pension plans, some of which provide benefits based to a certain extent on the age of the employee when first hired.

"The administration bill, which permits involuntary separation under bona fide retirement plans meets only part of the problem. It does not provide any flexibility in the amount of pension benefits payable to older workers depending on their age when hired, and thus may actually encourage employers, faced with the necessity of paying greatly increased premiums, to look for excuses not to hire older workers when they might have hired them under a law granting them a degree of flexibility with respect to such matters. That flexibility is what we recommend.

\*    \*    \*    \*    \*    \*

"So, Mr. Chairman, in order to meet these needs, I will introduce the following amendments to S. 830.

\*    \*    \*    \*    \*    \*

"Third, that a fairly broad exemption be provided for bona fide retirement and seniority systems which will facilitate hiring rather than deter it and make it possible for older workers to be employed without the necessity of disrupting those systems." [7]

Following this statement, Secretary of Labor Wirtz testified:

"There is also the effort in S. 830 to make quite clear the relationship which would necessarily be recognized between unjust discrimination and the retirement policies or systems to which Senator Javits has already referred . . . Section 4(a) reflects . . . simply the significant fact that *what we are doing here is to extend to individuals in situations not covered by collective bargaining agreements or established retirement policies,* a degree of protection against discrimination on the basis of age very much like what has evolved in private experiences and programs." [8]   (Emphasis supplied)

When asked about the effect of the proposed legislation on existing pension and insurance plans, Secretary of Labor Wirtz replied:

"It would be my judgment . . . that the effect of the provision in 4(f)(2) [the original bill] . . . is to protect the application of almost all plans which I know anything about . . . .. It is intended to protect retirement plans." [9]

Representatives of organized labor expressed reservations about § 4(f)(2) at the subcommittee hearings in both houses. As a legislative director for the AFL–CIO testified:

"We likewise do not see any reason why the legislation should, as is provided in section 4(f)(2) in the Administration bill, permit involuntary retirement of employees under 65 . . . .. Involuntary retirement would be forced, *regardless of the age of the employee,* subject only to the limitation that the retirement policy or system in effect may not be merely a

---

7. Hearings on S. 830 Before the Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 90th Cong., 1st Sess., at 27–28 (1967).

8. *Id.* at 43.

9. *Id.* at 53.

subterfuge to evade the Act."[10] (Emphasis supplied)

These witnesses later submitted proposed amendments to strike the provision allowing separation under a retirement policy.[11]

However, the union representatives were not successful in their efforts to remove the retirement provision from the bill, although the protection for seniority systems which they advocated was incorporated in the same section of the Act.

While the present form of § 4(f)(2) differs slightly from its original form in the Senate and House bills, we do not regard the difference as important. In commenting on the amendments which incorporate the present language of the Act, Secretary of Labor Wirtz, in testifying before the House committee, stated:

> "In the bill reported out by the subcommittee in the Senate there is a change in the language which refers to this point which you raised earlier, the relationship of this to established pension plans. We count that change as not going to the substance and involving matters going to clarification which would present no problem."[12]

Further, the text of the adopted amendment, "to observe the terms of a bona fide . . . employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter," is quite similar to that of the New York statute. That Act provides that its prohibition against age discrimination shall not "affect the retirement policy or system of any employer where such policy or system is not merely a subterfuge to avoid the purposes of said subdivision . . . ." Pennsylvania has a similar statute, Pa.Stat.Ann. tit. 43 § 955, and New Jersey's reads: " . . . nor to interfere with the operation of the terms or conditions and administration of any bona fide retirement, pension, employee benefit or insurance plan or program." New Jersey Stat.Ann. 10:5-2.1. These statutes were introduced into the record at the hearings[13] and were received with interest by the committees. Also introduced were New York's explanatory notes. They unequivocally stated that a plan formulated before enactment of the statute providing for compulsory retirement on pension at age 60 was lawful. When no retirement benefits were provided, however, the bona fides of the plan was subject to examination.[14]

The former Secretary of Labor obviously thought that bona fide retirement programs permitting involuntary retirement before age 65 were exempted from the Act. The interpretive bulletin, 29 C.F.R. § 860.110, issued by the Department of Labor soon after enactment of the statute reads:

---

**10.** Testimony of Andrew J. Biemiller, Director of Department of Legislation, AFL–CIO, Hearings on S. 830 Before the Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 90th Cong., 1st Sess., at 96. *See also* pp. 93, 98, 100. *See also* testimony of Kenneth A. Meiklejohn, legislative representative AFL–CIO, Hearings on H.R. 3651, H.R. 3768, and H.R. 4221 Before the General Subcomm. on Labor of the House Comm. on Education and Labor, 90th Cong., 1st Sess., at 411, 418. The testimony of both men took place after Senator Javits had proposed his amendments. It is obvious that the union representatives thought that the Javits' amendment did not exclude involuntary early retirement.

**11.** The proposed amendment was titled "Amendment to Eliminate Provision Permitting Involuntary Retirement From the Age Discrimination in Employment Act, and to Substitute Therefor Provision Safeguarding Bona Fide Seniority or Merit Syste˜ ˙" It would have delet-ed any reference in the exception to retirement plans, and thus have made age 65 applicable to them as it was to other forms of discrimination. For a discussion of the effect to be given committee proceedings, *see National Railroad Passenger Corp. v. National Assn. of Railroad Passengers,* 414 U.S. 453, 460–461, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974).

**12.** Hearings on H.R. 4221 Before the General Subcomm. on Labor of the House Comm. on Education and Labor, 90th Cong., 1st Sess., at 40.

**13.** Hearings on S. 830 Before the Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 90th Cong., 1st Sess., at 304, 306 (1967).

**14.** *Id.* at 251.

"Thus, the Act authorizes involuntary retirement irrespective of age, provided that such retirement is pursuant to the terms of a retirement or pension plan meeting the requirements of section 4(f)(2). The fact that an employer may decide to permit certain employees to continue working beyond the age stipulated in the formal retirement program does not, in and of itself, render an otherwise bona fide plan invalid insofar as the exception provided in section 4(f)(2) is concerned.

"(b) This exception does not apply to the involuntary retirement before 65 of employees *who are not participants in the employer's retirement or pension program.* It should be noted that section 5 of the Act directs the Secretary of Labor to undertake an appropriate study of institutional and other arrangements giving rise to involuntary retirement, and report his findings and any appropriate legislative recommendations to the President and to Congress." [15] (Emphasis supplied)

The bulletin demonstrates the Secretary's recognition of the difference between retirement with and without a pension; the financial effect of the latter being the same as outright discharge. Succeeding Secretaries, however, have revised the Department's position. Pursuant to the statutory directive, the Secretaries have submitted annual reports to Congress through 1976

discussing plans that mandate retirement before age 65. In the report of January 31, 1976, Secretary Brennan articulated the department's position:

"[R]etirements [before 65] are unlawful unless the mandatory retirement provision: (1) is contained in a bona fide pension or retirement plan, (2) is required by the terms of the plan and is not optional, and (3) is essential to the plan's economic survival or to some other legitimate purpose—*i. e.,* is not in the plan for the sole urpose [sic] of moving out older workers, which purpose has now been made unlawful by the ADEA." [16]

This is the interpretation that the Secretary urged upon the courts in both *Brennan v. Taft Broadcasting Co., supra,* and *McMann v. United Air Lines, Inc., supra.*

In adopting this stance, the Secretary ignored the obvious and important distinction implicit in his previous bulletin between discharge without pay and retirement on a pension. Moreover, the Secretary's latter day position is not only contrary to that taken by his predecessor contemporaneously with the consideration and passage of the Act, but also to the views of the Congressional committees which declined that proposal when it was forthrightly presented to them. Thus, rather than proposing an amendment to Congress, as Congress had instructed, the Secretary seeks to change the Act by court decision or administrative fiat.[17]

---

**15.** 34 F.R. 9709, June 21, 1969. The text has remained unchanged through the 1975 edition of the Code of Federal Regulations despite the Secretary's change in position. *See* 29 C.F.R. § 860.110.

A working paper prepared for the Senate Special Committee on Aging commented that the study on involuntary retirements had not been completed. It suggested that the Secretary could be asked to prepare a report on whether early involuntary retirement should be continued as an exception and, if so, whether such factors as age and amount of reduced retirement benefits should be considered. Staff of Senate Special Committee on Aging, 93d Cong., 1st Sess. Working Paper on Improving the Age Discrimination Law (Comm. print 1973, p. 18).

**16.** Dept. of Labor, January, 1975, report pertaining to activities in connection with the Age

Discrimination in Employment Act of 1967, at 17 (1975).

**17.** The Supreme Court was confronted with a similar situation in *General Electric v. Gilbert,* 429 U.S. 125, 142, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1976), when it said:

"The EEOC guideline in question does not fare well under these standards.

It is not a contemporaneous interpretation of Title VII, since it was first promulgated eight years after the enactment of that Title. More importantly, the 1972 guideline flatly contradicts the position which the agency had enunciated at an earlier date, closer to the enactment of the governing statute.

*  *  *  *  *  *

"We have declined to follow administrative guidelines in the past where they conflicted with earlier pronouncements of the agency.

There are many cogent, persuasive arguments why involuntary retirement, even with an adequate pension, should not be permitted before age 65.[18] Logically, allowing such a broad exemption may be inconsistent with the prohibition against discrimination in hiring and produce the anomaly that a person who has been involuntarily retired by one company before 65 may not be discriminated against in applying for employment at another company.[19] Similarly, as the Secretary suggests, there may be serious objections to allowing retirement to be at the company's option. As written, however, the statute does not limit its exemption for bona fide plans to those meeting the Secretary's three criteria.

Such arguments miss the mark when urged upon a court in support of a statutory interpretation. An exemption's merits are properly matters of legislative concern and evaluation. Congress has chosen to exclude retirements pursuant to bona fide retirement plans so long as the plan is not a subterfuge. That choice is binding upon us. As the Supreme Court recently noted, "the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one." *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 314, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976).

We leave to congressional consideration the broad policy questions underlying the desirability of regulating the minimum age for compensated involuntary retirement.

Factors such as the population's gradually increasing average age and the proper methods of insuring the stability of the Social Security Plan may argue for an even higher retirement age. On the other hand, unemployment prevalent among younger members of society and a developing trend to distribute available employment by the use of a four day work week pull in the opposite direction. Further, the enactment of the Pension Reform Act of 1974 may be an important factor, concerned as it is with the financial stability of retirement plans and transferability of benefits.

The fact that the legislation requires the Secretary to study involuntary retirement and submit legislative recommendations to the President and Congress shows recognition of the problem by the legislature. It chose to await further data before deciding what, if any, further action is warranted. Legislation need not address itself to all the problems in any given area at one time. Particularly when the effects of a policy are not susceptible to accurate prediction, Congress may well decide that prudence dictates a tentative, experimental approach. It is not the function of the courts to accelerate that process when Congress unquestionably is acting within its proper scope.

In the case *sub judice,* the parties concede that the plan is bona fide and the pension payable not unreasonable—certainly not so small as to brand the plan a subterfuge to evade the purposes of the Act.[20] The sole attack is that the plan's

---

[citations] In short, while we do not wholly discount the weight to be given the 1972 guideline, it does not receive high marks when judged by the standards enunciated in *Skidmore* [*v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944)]."

**18.** *See* Levien, The Age Discrimination in Employment Act: Statutory Requirements and Recent Developments, 13 Duq.L.R. 227 (1974); Agatstein, The Age Discrimination in Employment Act of 1967: A critique, 19 N.Y.L.F. 309 (1973); *cf.* The Constitutional Challenges to Mandatory Retirement Statutes, 49 S.J. L.R. 748 (1975); Age Discrimination in Employment: Correcting a Constitutionally Infirm Legislative Judgment, 47 S.Cal.L.Rev. 1311 (1974); *But see, Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976).

**19.** In *McMann v. United Air Lines, Inc.,* supra, the court of appeals reasoned that there is no difference between a mandatory retirement at age 62 and a refusal to hire a person that age, citing *Hodgson v. American Hardware Mutual Ins. Co.,* 329 F.Supp. 225 (D.Minn.1971). However, the opinion did not note that in the cited case the district court ruled on the "retirement" of the complainant who did not participate in the pension plan and those who did were held to be within the exception of § 4(f)(2).

**20.** *See* Kovarsky, Economic, Medical and Legal Aspects of the Age Discrimination Laws in Employment, 27 Vand.L.Rev. 839, 910–912 (1974). In Age Discrimination in Employment Under Federal Law, 9 Ga.St.B.J. 114 (1972), the author postulates that if a plan is not obviously

retirement at age 60 provision unlawfully discriminates because of age. An employee reaching age 60 may be forced to retire because of that fact, although one who is 59 remains at his job. From that viewpoint, there is obviously discrimination because of age, just as there is in any retirement plan—voluntary or involuntary. But that discrimination, existing because of the terms of a bona fide retirement plan, is exempt from the scope of the Act, just as is involuntary retirement at any age beyond 65 or before 40. To summarize, involuntary retirement pursuant to a bona fide plan that is not a subterfuge but which requires or permits retirement at age 60 at the option of the employer is not unlawful.

Accordingly, the plaintiff's contentions must fail, and the judgment of the district court will be affirmed.

a subterfuge on its face, the question of whether it is bona fide is simply a matter of degree.

The legislative history on the distinctions Congress intended to draw between "subterfuge" and "bona fide" is not helpful. Because the factors which might enter into such categorizations depend upon the factual background, we do not think it advisable to catalogue them in this case.