George S. SMART, Jr.,
Plaintiff-Appellant,

v.

PORTER PAINT CO.,
Defendant-Appellee.

No. 80–1028.

United States Court of Appeals,
Seventh Circuit.

Argued May 8, 1980.

Decided Aug. 7, 1980.

Rehearing and Rehearing En Banc
Denied Oct. 31, 1980.

Judith T. Kirtland, Indianapolis, Ind., for plaintiff-appellant.

Ronald D. Ray, Louisville, Ky., for defendant-appellee.

Before FAIRCHILD, Chief Judge, NICHOLS, Judge,* and CUDAHY, Circuit Judge.

CUDAHY, Circuit Judge.

This appeal involves an action under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.* (1976 & Supp. II 1978), brought against Porter Paint Company (the "Company") by its former employee, plaintiff George S. Smart, Jr. The district court granted the Company's motion for summary judgment on the grounds that the Company had a defense to the action under § 4(f)(2) of the ADEA, 29 U.S.C. § 623(f)(2) (1976).[1]

Smart argues on appeal that § 4(f)(2) of the ADEA does not provide the Company with a complete defense because the Company did not meet the requirements of that section. More specifically, he argues that the Company did not "observe the terms" of its pension plan when it involuntarily terminated him shortly after his 60th birthday. He also argues that the amendment of the Company's plan to provide for a normal retirement age of 60 constitutes a "subterfuge" and that the amended plan is not "bona fide" within the meaning of § 4(f)(2). Smart also contends that the amendments to § 4(f)(2), which became effective in 1978,[2] providing, *inter alia*, that an employee benefit plan shall not require or permit the involuntary retirement of any individual between the ages of 40 and 70, should be given retroactive effect so as to make § 4(f)(2) unavailable as a defense in this case.

The Company filed several affidavits and other documentary evidence setting forth certain facts in support of its motion for summary judgment. Smart filed no affidavits in opposition but relied upon the failure of the Company's affidavits to establish as a matter of law that § 4(f)(2) provided a

---

* The Honorable Philip Nichols, Jr., Judge of the United States Court of Claims, is sitting by designation.

1. Section 4(a) of the ADEA of 1967, 29 U.S.C. § 623(a) (1976) provides:

   It shall be unlawful for an employer—(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age
   . . . .

   Section 4(f) of the ADEA of 1967, 29 U.S.C. § 623(f) (1976 & Supp. I 1978) provides:

   It shall not be unlawful for an employer, employment agency, or labor organization—
   \* \* \* \* \* \*
   (2) to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter . . . .

2. The Age Discrimination in Employment Act Amendments of 1978, Pub.L. No. 95–256, 92 Stat. 189, codified at 42 U.S.C. § 623 et seq. (Supp. II 1978).

complete defense. We vacate the district court order granting summary judgment and remand for further proceedings.

### Facts

Roy D. Krueger, Director of Personnel for the Company, recited the following facts in his affidavit. Smart began his employment with the Company on November 11, 1935, as a salesman. In 1954, he was promoted to the position of district manager of the Company's Indiana district and remained in that position until his involuntary retirement on August 1, 1976.

The Company's retirement plan ("Plan") was created on December 31, 1959, and remained in existence until December 31, 1978. The Plan was amended, effective January 1, 1976, to reduce the normal retirement age from 65 to 60 years, and to further provide that, at the option of the Company, an employee could continue working beyond his normal retirement date. In his affidavit Krueger specifically stated that

> The amended [P]lan was drafted and approved by legal counsel as complying with all applicable laws including the Age Discrimination in Employment Act. In amending the Plan, the Company relied in good faith on such approval by legal counsel and his understanding of the Department of Labor's position and interpretation that mandatory retirement irrespective of age pursuant to a bona fide pension plan or retirement plan was lawful under the ADEA.

The Company's Plan has regularly paid substantial benefits to the employee/members who retire under it.

When the Plan was amended, the Company was unaware that Smart was not going to retire voluntarily at age 60 because for some time prior to January 1, 1976, Smart had given every indication that he was going to retire voluntarily at 60. When Smart indicated that he did not want to retire at 60, the Company followed its normal procedure of consulting with his supervisors and accepting their recommendations. On the basis of the recommendation of certain of his supervisors, the Company involuntarily retired Smart on August 1, 1978, his normal retirement date under the Company's amended Plan. Thus, Smart was retired pursuant to the terms of the Company's amended Plan, which, as indicated, provided for retirement at the normal retirement age of 60, unless the Company exercised its option to allow the employee to continue to work beyond his normal retirement date. Pursuant to the retirement income provisions of the Plan, Smart receives $12,219.48 annually as retirement benefits.

For the period from January 1, 1976, until the date of the Plan's termination on December 31, 1978, Smart was the only employee who involuntarily retired on his normal retirement date (at age 60). During this same period 24 employees attained their normal retirement date, and of these 18 were permitted to continue working beyond that date. One, Smart, was involuntarily retired; the remaining 5 employees retired voluntarily on their normal retirement date. One of the 18 employees who continued working beyond their normal retirement date was involuntarily retired six months later.

Arvil L. Short, Vice President of Trade Sales for the Company, indicated in an affidavit that the Company was, and had been for some time, disappointed with Smart's performance as a district manager but that the Company had not terminated Smart because he had been a faithful employee for 30 years and had been an excellent salesman. No representative of the Company had discussed this problem with Smart, and the Company believed that Smart intended to seek early retirement at age 60.

An affidavit of Edwin H. Perry, an attorney with the law firm which represented the Company as its General Counsel, indicated that during the summer and fall of 1975 he had attended a series of meetings with the executives of the Company in connection with certain changes to be made in the Company's retirement Plan. Among the changes proposed was a reduction in the normal retirement age from 65 to 60. Per-

ry was aware that the Department of Labor, through its regulations, had interpreted the ADEA to authorize involuntary retirement prior to age 65 as long as such retirement was pursuant to the terms of a bona fide retirement or pension plan. It was, therefore, Perry's opinion that the reduction of the normal retirement age to age 60 would be lawful under the ADEA, as interpreted by the Department of Labor ("DOL"). Perry stated that he drafted the amendment to the Plan, including the reduction of the retirement age, based upon his understanding of the law, and that to the best of his knowledge the Company relied in good faith upon his approval of the amendment and the restatement of the Plan as complying with all applicable laws.

Shortly after his involuntary retirement Smart complained to the DOL, asserting his allegedly unlawful termination and his intent to file suit. In August 1978, DOL notified Smart of the failure to eliminate the alleged unlawful discriminatory act through informal conciliation and Smart filed his complaint in this proceeding on October 5, 1978.

About six months after the filing of the complaint, Smart served interrogatories which sought information pertaining to Smart's retirement, the Plan, benefits paid under the Plan and the amendment of the Plan in 1976. No further discovery was sought by Smart and on October 3, 1979, the Company filed a motion for summary judgment on the limited issues of (1) the lawfulness of its involuntary retirement of Smart under the terms of § 4(f)(2) of the ADEA and (2) its alleged good faith reliance on the DOL's published regulations allegedly authorizing involuntary retirement prior to age 65 pursuant to a bona fide retirement or pension plan.

The Company submitted affidavits and other documentary materials in support of its motion for summary judgment. Smart did not submit any affidavits or other evidence in opposition to the motion for summary judgment. Although the Company's affidavits contain information about the reasons for Smart's retirement at age 60

and about the Company's good faith reliance on its counsel's approval of the 1976 amendment, they provide no information at all as to why the normal retirement age was lowered from 65 to 60.

The district court granted the Company's motion for summary judgment on the grounds that (1) the Company had been "observ[ing] the terms" of (2) a "bona fide" retirement plan (3) which was not a "subterfuge" to evade the purposes of the ADEA. The district court declined to reach the Company's other defense that it had relied in good faith on a regulation published by the DOL concerning the legality of involuntary pre-65 retirement pursuant to a plan, in accordance with § 10 of the Portal-to-Portal Act, 29 U.S.C. § 259 (1976), which was incorporated into the ADEA by reference in 29 U.S.C. § 626(e) (1976).

1. *Availability of a Defense under § 4(f)(2) of the ADEA of 1967*

█ The facts established by the affidavits and other documents filed by the Company are uncontested. For purposes of this motion for summary judgment, we must assume that Smart was terminated at age 60 solely because of his age. The question is, therefore, whether the Company's affidavits and other documents establish facts which, *as a matter of law*, provide a complete defense for the Company under § 4(f)(2) which would entitle it to summary judgment. In establishing a § 4(f)(2) defense, the Company must demonstrate the existence of three elements: (1) the Company must have been observing the terms (2) of a bona fide retirement plan (3) which is not a subterfuge to evade the purposes of the ADEA. *United Airlines, Inc. v. McMann*, 434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977); *Brennan v. Taft Broadcasting Co.*, 500 F.2d 212 (5th Cir. 1974). *See also Minton v. Whirlpool Corporation*, 569 F.2d 1012 (7th Cir. 1978).

A. *"Observing the Terms"*

█ In *Sexton v. Beatrice Foods Co.*, 630 F.2d 478 (7th Cir. 1980), we held that, for an employer to "observe the terms" of a

retirement plan when it forces an employee to retire either the plan must contain a mandatory retirement age or the plan must grant the employer the right to force retirement at an appropriate age of his choosing. Although these conditions are only necessary and not always sufficient to meet the § 4(f)(2) exception (with respect to "observ[ing] the terms"), they appear to have been met in the instant case. Age 60 is the "normal" retirement date established by the amended Plan, but at its option, the Company may extend employment beyond that date. As we understand it, the annual retirement benefit to which an employee such as Smart would be entitled if he retired at 60 is the same as the benefit to which he would be entitled if he continued to work up to age 65.

Smart argues here that the Company did not "observe the terms" of the retirement Plan because, of the 24 persons who were sixty or older when the amended Plan was in effect (January 1, 1976 to December 31, 1978), 18 were permitted to work beyond their "normal" retirement dates (although one was involuntarily retired 6 months later). Of the remaining 6 employees, 5 voluntarily retired at 60 and Smart was involuntarily retired at age 60. Thus, fewer than 25% of the employees who reached 60 during the relevant period retired at 60 and only one person was forced to retire at the "normal" retirement age.

Nonetheless, the terms of the Plan provide for involuntary retirements at age 60 or older at the option of the Company. Arrangements giving the employer similar latitude have been approved in several leading cases, including one in this circuit. See *Zinger v. Blanchette*, 549 F.2d 901 (3rd Cir. 1977), *cert. denied*, 434 U.S. 1008, 98 S.Ct. 717, 54 L.Ed.2d 750 (1978); *Marshall v. Hawaiian Telephone Company*, 575 F.2d 763 (9th Cir. 1978); *Minton v. Whirlpool Corporation*, 569 F.2d 1012 (7th Cir. 1978). *But see Marshall v. American Motors Corporation*, 475 F.Supp. 875 (E.D.Mich.1979). In the instant case, the Company did in fact observe the "normal" retirement date when it forced Smart to retire, although in many other instances it may have ignored it. However, the differing treatment accorded others under the same Plan is not a matter which we may now question under the rubric of "observ[ing] the terms" because the Plan's terms give the Company the option of retiring its employees at different ages.

We therefore agree with the district court's finding that the Company "observe[d] the terms" of its Plan within the meaning of § 4(f)(2) when it forced Smart to retire.

### B. "A Bona Fide Plan"

■ Smart also contends that the requirement that the Plan be *bona fide* was not met here because in only one case (Smart's) was the "normal" retirement date implemented on an involuntary basis by the Company. Hence, Smart argues that the Plan is a "sham." As we have indicated in our discussion of "observ[ing] the terms," the Plan may have been applied differently to different participants at age sixty and above. But this does not necessarily mean that the Plan was not "bona fide" because a plan is generally considered bona fide within the meaning of § 4(f)(2) if it is "genuine" or "authentic," i. e., a plan which has truly existed and has actually paid benefits to employees retiring under it. *Brennan v. Taft Broadcasting Company*, 500 F.2d 212, 217 (5th Cir. 1974); *Marshall v. Hawaiian Telephone Company*, 575 F.2d 763 (9th Cir. 1978). *Accord United Airlines, Inc. v. McMann*, 434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977).

Smart has not argued that the Company's Plan is not bona fide because it does not exist and pay benefits, so we conclude it is bona fide in the usual sense. Nor has Smart cited any authority in support of his argument that the Company's Plan is not bona fide because the Company exercised its option to retire employees at different ages pursuant to the express provisions of the Plan. We note that regulations issued by the DOL support the district court's resolution of this issue because they specifically provide that

[t]he fact that an employer may decide to permit certain employees to continue working beyond the age stipulated in the formal retirement program, does not, in and of itself, render an otherwise bona fide plan invalid insofar as the exception provided in Section 4(f)(2) is concerned. 29 C.F.R. § 860.110 (1980).

We therefore find no error in the district court's conclusion that the Company's Plan was bona fide.

### C. "Subterfuge"

In the instant case, Krueger's affidavit states that the Plan was amended in 1976 to provide for normal retirement at age 60. The district court stated that the 1959 Plan required retirement at 65 but the 1976 amendment provided for a normal retirement age of 60.[3] The Company sought summary judgment on the basis that it complied with the requirements of § 4(f)(2) so it must show that there is no question of material fact as to whether the 1976 amended Plan is a subterfuge to evade the ADEA.

In *McMann v. United Airlines, Inc.*, 434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977), the Supreme Court considered whether an employee benefit plan which provided that the normal retirement age was 60 was a "subterfuge" within the meaning of § 4(f)(2). After analyzing the legislative history of the ADEA the Court stated that

we find nothing to indicate Congress intended wholesale invalidation of retirement plans instituted in good faith *before its passage*, or intended to require employers to bear the burden of showing a business or economic purpose to justify bona fide *pre-existing* plans . . . . In ordinary parlance, and in dictionary definitions as well, a subterfuge is a scheme, plan, stratagem, or artifice or evasion. In the context of this statute,

"subterfuge" must be given its ordinary meaning and we must assume Congress intended it in that sense. So read, a plan established in 1941, if bona fide, as is conceded here, cannot be a subterfuge to evade an Act passed 26 years later. To spell out an intent in 1941 to evade a statutory requirement not enacted until 1967 attributes, at the very least, a remarkable prescience to the employer. We reject any such *per se* rule requiring an employer to show an economic or business purpose in order to satisfy the subterfuge language of the Act. 434 U.S. at 203, 98 S.Ct. at 450. [Emphasis supplied].

Thus *McMann* established that the term "subterfuge" was to be given its ordinary meaning and strongly implied that evidence of an employer's intent, including its business or economic purpose, may, under some circumstances, be relevant to the question whether a plan which authorizes retirement before age 65 is a subterfuge. Although in *McMann* the Court stated that it was not necessary for an employer to show a business or economic purpose for a plan adopted before the ADEA was enacted in 1967, this does not preclude us from requiring that the employer must state some nondiscriminatory purpose or purposes for its actions if it adopts or amends a plan *after* 1967 and wishes to avail itself of the § 4(f)(2) exemption by means of a motion for summary judgment.

We conclude that, where a post-ADEA amendment lowering the "normal" or "mandatory" retirement age below age 65 is the subject of inquiry, an employer's motion for summary judgment requires a prima facie showing that subterfuge is not present. This in turn requires some evidence of the purpose or purposes which the amendment in question is intended to serve.

**3.** Counsel for the Company maintained at oral argument that the Company had the power under the 1959 Plan to force employees to retire at 60. The Company maintains that the 1976 amended Plan did not change its rights in this respect and therefore cannot be considered a subterfuge. However Krueger's affidavit and the district court's discussion do not support this interpretation of the Company's rights under the 1959 Plan (which apparently was not raised in the district court), so we feel it would be inappropriate to affirm the grant of summary judgment on this basis. The Company is, of course, free to raise this argument in the district court on remand.

Precisely how such evidence of purpose or motive is to be construed or weighed in connection with other evidence in evaluating the subterfuge issue we leave to later determination. Certainly, however, we do not perceive how it is possible to evaluate whether a post–ADEA amendment is a subterfuge without some evidence of the amendment's purpose. This approach has been used in several recent cases.

Thus in *Marshall v. Atlantic Container, G.I.E.*, 18 Empl.Prac.Dec. ¶ 8849, *motion for summary judgment reconsidered and granted*, 470 F.Supp. 71 (S.D.N.Y.1979), the court considered evidence of various purposes for a plan amendment lowering the retirement age to 62. For example, there was evidence of a purpose to "provide ascension opportunities while also providing proper levels of retirement benefits." There was also evidence that the plan amendment was intended "to close the gap between the retirement age in Britain and the United States . . [and] to bring young people into the company to train them." 470 F.Supp. at 73. The court held that there was sufficient evidence to conclude that the early retirement provision was "not a subterfuge to evade the purposes" of ADEA, but had, on the contrary, clear and direct "business purposes," so the court granted summary judgment for the employer.

In *Marshall v. Eastern Airlines, Inc.*, 474 F.Supp. 364 (S.D.Fla.1979), the employer lowered the normal retirement age from 65 to 62 in 1974. Both parties moved for summary judgment on the issue whether lowering the normal retirement age was a "subterfuge." The court stated that since the employer "presented no evidence to show that the early retirement amendment to its retirement plan had any business purpose other than arbitrary age discrimination," it would grant summary judgment for the Secretary of Labor because the amended plan "clearly constituted a subterfuge to evade the purposes of ADEA." 474 F.Supp. at 369.

We do not agree with the Company's contention that "the critical factor in determining whether the amendment to the Porter Paint retirement plan was a subterfuge is whether the Plan as amended continued to pay substantial benefits." We believe, as indicated, that this factor goes primarily to the question whether the amended Plan is "bona fide." The further contention that the mere payment of substantial benefits to an early retiree removes the possibility of subterfuge was approved by the Third Circuit in *Zinger v. Blanchette, supra*, but was rejected by the Supreme Court in *McMann, supra*. Further, although the Third Circuit in *Zinger* expressly declined to rest its conclusion on the pre–ADEA adoption of the plan involved in that case, as the Supreme Court did in *McMann*, the facts in *Zinger* did not, as here, involve an amendment adopted *after* ADEA came into force. The question of subterfuge in the context of an amendment lowering the "normal" retirement age after the enactment of ADEA has not yet been decided by any Court of Appeals but has been considered in the district court opinions in *Atlantic Container* and *Eastern Airlines, supra*. We agree with the approach used in these cases.[4]

■ In conclusion, we note that our requirement that an employer seeking summary judgment submit evidence of the purpose of the amendment is not limited to economic or business purpose (although

---

**4.** In *Marshall v. Baltimore & Ohio Railroad Company*, 461 F.Supp. 362 (D.Md.1978), *appeal pending* Nos. 79–1210 and 79–1211 (4th Cir.), the court found that an amended plan lowering the normal retirement to 62 was not a subterfuge because the amended plan paid substantial benefits and therefore could not be a subterfuge under *Zinger, supra*. It also based its conclusion on the undisputed fact that the employer had "always had the power to involuntarily retire [its] employees . . . . The mere codification of this power in 1972" does not constitute a subterfuge. 461 F.Supp. at 375. We do not find *B&O* persuasive authority for the Company's argument in the instant case because it relied upon an aspect of *Zinger* which we have rejected. We also note that there was extensive evidence of a business purpose for lowering the normal retirement age in *B&O*, although the court did not rely on it. Had the *B&O* court not relied on *Zinger* as it did, the evidence of business purpose might have been weighed with other evidence in evaluating the subterfuge issue.

these areas would be likely sources of purposes to change pension plans). The relevant purpose might, for example, be legal in nature. But again it is inconceivable that the district court could evaluate subterfuge without some facts relating to purpose or motive. Although Smart has not seen fit, by affidavits or other documents, to create any issues of material fact, the facts based on the Company's uncontradicted affidavits and other documentary evidence—lacking any showing of purpose or motive—are inadequate to establish a complete § 4(f)(2) defense as a matter of law. We therefore vacate the district court's order granting summary judgment for the Company and remand for further proceedings not inconsistent with this opinion.

### 2. Effect of 1978 Amendments

■ In 1978, Congress amended § 4(f)(2) of the ADEA by adding to that section a proviso that "except that . . . no such seniority system or employee benefit plan shall require or permit involuntary retirement of any individual . . . because of the age of such individual . . . ." 29 U.S.C. § 623(f)(2) (Supp. II 1978). Under the law as amended, the district court's decision in the instant case, as well as in *McMann, Zinger, Hawaiian Telephone, Minton* and like cases would be overruled. The great weight of federal case law and the legislative history of the 1978 amendments, however, clearly suggest that these amendments be given prospective applications only. *See Marshall v. B. & O., supra,* and *Marshall v. Delaware River and Bay Authority,* 471 F.Supp. 886, 889–91 (D.Del. 1979). *But see Davis v. Boy Scouts of America,* 457 F.Supp. 665 (D.N.J.1978).

In *Bradley v. School Board of City of Richmond,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974), the Supreme Court said

> A court is to apply the law in effect at the time it renders [the] decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary.

In the instant case it would be manifestly unjust to apply the 1978 amendment, which was enacted more than two years after Smart's retirement, when the facts before us suggest that the Company attempted to comply with the law in effect at the time of the retirement and purported to rely on the provisions of the ADEA, the regulations and opinions of the Department of Labor and such case law as was then in existence. In addition, the legislative history of the 1978 amendments make it clear that Congress did not intend them to have a retroactive effect. Senator Williams, the floor and conference manager of the 1978 amendments, in answer to a question regarding the retroactive effect of the bill as to forced retirement prior to the effective date of the amendments, said:

> The bill is not retroactive. The question of mandatory retirement prior to the effective date of the bill will be determined by the court's interpretation of existing law. 123 Cong.Rec. S17304 (Daily ed. Oct. 19, 1977).

In addition, the Supreme Court in *McMann* apparently rejected the argument that the then proposed 1978 amendments should be read as clarifying the intent of the original drafters of ADEA. Thus the Court said: "legislative observations 10 years after passage of the Act are in no sense part of the legislative history." 434 U.S. at 200, n.7, 98 S.Ct. at 449 n.7. Hence we decline to give retroactive effect to the 1978 amendments.

### 3. The Company's Alleged Good Faith Reliance Upon Certain DOL Published Regulations

Section 7(e) of the ADEA, 29 U.S.C. § 626(e) (1976), incorporates by reference Section 10 of the Portal-to-Portal Act of 1947, which provides in relevant part that:

> . . . no employer shall be subject to any liability . . . if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval or interpretation, of the agency . . . . 29 U.S.C. § 259(a) (1976).

In reliance upon these provisions the Company asserts as an affirmative defense its good faith reliance upon DOL's published regulations. The district court found it unnecessary to address the question of this defense but it might appropriately address this issue on remand.

### 4. Conclusion

We conclude that the undisputed facts so far presented are insufficient to sustain as a matter of law the availability of § 4(f)(2). Hence we vacate the district court order granting summary judgment and remand for further proceedings in accordance with this opinion.

Vacated and Remanded.

NICHOLS, Judge, concurring:

I concur with no reservation in Judge Cudahy's opinion. I would like to make the following additional points.

It is as I understand typical of private industrial companies, and was the case here, that middle-management executive or administrative employees had no *Roth*-type expectation of continued employment based on a "legitimate claim of entitlement to it." (*Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). The lowering of "normal retirement" from 65 to 60 did not confer on the employer any additional legal right to get rid of employees unwanted because of age or any other reasons. What it did was to vest the entitlement to pensions at the earlier age and thus make it more costly to get rid of an employee aged between 60 and 65. It would, however, require a Board of Directors of more than usual intestinal fortitude to fire an employee of thirty years service, within the last five years before vesting, unless the company was in dire financial straits, while after vesting it would be much easier. Therefore, it is possible enough to notice on summary judgment, that the whole exercise was a subterfuge to get rid of Mr. Smart. It should be a simple matter to explain the real reason for the change, if there was a different one. I suspect it may turn out to have been a tax problem. The texts of the plan, before and after the change, are in our record. We judges are not such innate experts on pension plans that we can winnow out the intended legal and economic effects of a change in one, even if the answer, when given, rests on the texts, plus statutes and regulatory materials we could take judicial notice of when called to our attention. I entirely agree we are not required to postulate a reason where none is stated. It is the defendant's misfortune that to the uninformed, the whole operation looks at first glance like a contrivance to do Mr. Smart in, though easing his downfall with his pension.