**EQUAL EMPLOYMENT OPPORTUNI-
TY COMMISSION, Plaintiff-Appel-
lant,**

v.

**The HOME INSURANCE COMPANY,
Defendant-Appellee.**

No. 67, Docket 81–6055.

United States Court of Appeals,
Second Circuit.

Argued Sept. 4, 1981.
Decided Jan. 26, 1982.

Mark S. Flynn, Washington, D. C. (Leroy
D. Clark, Gen. Counsel, Philip B. Sklover,
Acting Associate Gen. Counsel, Vella M.
Fink, Asst. Gen. Counsel, Deborah Reik,
Equal Employment Opportunity Com'n,
Washington, D. C., on brief), for plaintiff-
appellant.

Martin D. Heyert, New York City (Eu-
gene T. D'Ablemont, Kelly Drye & Warren,
New York City, on brief), for defendant-ap-
pellee.

Before NEWMAN and KEARSE, Circuit Judges, and EGINTON,* District Judge.

KEARSE, Circuit Judge:

Plaintiff Equal Employment Opportunity Commission ("EEOC") appeals from a judgment of the United States District Court for the Southern District of New York, Leonard B. Sand, *Judge*, dismissing the EEOC's complaint charging defendant The Home Insurance Company ("Home") with age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA" or "Act"), 29 U.S.C. §§ 621-634 (1976). The district court, ruling that the stipulated facts showed that Home's action in lowering the mandatory retirement age for its employees was not a subterfuge to evade compliance with the Act, and that Home had attempted in good faith to comply with the Act, granted Home's motion for summary judgment. Because we conclude that there were genuine issues as to material facts, we vacate the judgment and remand for further proceedings.

## FACTS

The following facts, except to the extent indicated, are not in dispute.

### A. *Home's Retirement Plan*

Since 1948 Home has maintained a noncontributory retirement plan (the "Plan") for its employees. Under the terms of the Plan that were in effect until December 31, 1973, the normal retirement age, *i.e.*, the age at which an employee was allowed to retire and receive full pension benefits without actuarial reduction, was 65. The mandatory retirement age, *i.e.*, the age at which an employee was required to retire, was also 65. The Plan also allowed employees to retire between the ages of 55 and 65 at reduced pensions. Home stated that during the period 1969 through 1972, a substantial number of Home employees had opted for early retirement with reduced pension benefits, and that the average age of such early retirees was under 62.

Effective January 1, 1974, Home amended its Plan to, *inter alia*, lower both the normal and the mandatory retirement ages from 65 to 62. The amount of full pension benefits, which accordingly became payable at age 62, was increased. The earliest age at which an employee could retire early with reduced benefits remained 55, and the percentages of accrued benefits payable to those who retired early were increased.

In December 1978, the United States Secretary of Labor, after receiving a complaint from a Home employee and attempting informal negotiations with Home, commenced the present action [1] for monetary and injunctive relief, contending that Home,[2] by lowering the mandatory retirement age from 65 to 62, had violated § 4(a)(1) of the ADEA.[3] Home contended (a) that in enforcing the lower mandatory retirement age it was simply observing the terms of a bona fide employee retirement plan and hence was acting lawfully under § 4(f)(2) of the Act,[4] and (b) that in lowering the

---

* The Honorable Warren W. Eginton, of the United States District Court for the District of Connecticut, sitting by designation.

1. The EEOC was substituted for the Secretary of Labor in 1979, when authority to enforce the ADEA was transferred to the EEOC. *See* Reorganization Plan No. 1 of 1978, 3 C.F.R. 263 (1978 Compilation) *reprinted in* 5 U.S.C. App., at 354 (Supp. III 1979).

2. Cityhome Corp., was also made a defendant, but the parties thereafter stipulated to the dismissal of the action against it.

3. ADEA § 4(a)(1), 29 U.S.C. § 623(a), provides as follows:
   (a) It shall be unlawful for an employer—

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age. . . .

4. ADEA § 4(f), 29 U.S.C. § 623(f), provides as follows:
   [(f)] It shall not be unlawful for an employer, employment agency, or labor organization—
   (1) to take any action otherwise prohibited under subsections (a), (b), (c), or (e) of this section where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business, or where the differentiation is based on reasonable factors other than age;

mandatory age Home had acted in good faith reliance on, and in conformity with, interpretations of the ADEA by the Wage-Hour Administrator of the Department of Labor, and that its actions were therefore immunized by § 10 of the Portal-to-Portal Act, 29 U.S.C. § 259 (1976) ("Portal Act").[5] The EEOC contended that Home's action was not protected by § 4(f)(2) of the ADEA because the action was mere subterfuge to evade compliance with the Act, and that the Portal Act defense was not available to Home because its action was not in conformity with the administrative rulings to which Home pointed.

### B. *The Stipulated Events Leading to Home's Lowering of the Mandatory Retirement Age*

Following discovery, both sides moved for summary judgment. The parties entered into a stipulation of facts that was to "constitute the complete record for purposes of the parties' motions for summary judgment." The stipulation gave the following background of Home's lowering of the retirement ages.

For some years prior to 1973 it had been Home's practice to conduct, every five years, a review of its employee benefit plans to ensure that Home remained competitive in the labor market. Pursuant to that practice Home commenced a review in 1973 with the aid of the employee benefit consulting firm of Towers, Perrin, Forster & Crosby ("Towers, Perrin").

Towers, Perrin made a report to Home recommending two steps pertinent to the present case. First, it recommended that Home lower the normal retirement age from 65 to 62, thus allowing an employee to retire earlier and receive full pension benefits. Second, it recommended that the fractional pension benefits payable to employees who took "early" retirement be increased. This report neither recommended nor discussed any lowering of the mandatory retirement age.

The Towers, Perrin report was reviewed by Home's Retirement Committee, chaired by Home's Senior Vice President and General Counsel, Joseph F. Quinn. The Retirement Committee agreed with Towers, Perrin's recommendations and, in addition, decided to recommend to Home's management that not only the normal retirement age, but also the mandatory retirement age, be lowered. According to Quinn's testimony at his deposition, the purpose of the Committee's proposed reduction of the mandatory retirement age was to reduce the number of "spontaneous" retirements—i.e., early retirements that left Home with no adequately trained employees to fill the vacated positions. The Committee's report to Home's board of directors did not contain any discussion of the proposed reduction in the mandatory retirement age or of the spontaneous retirements problem that assertedly prompted the recommendation.

In presenting the Committee's recommendations to the board, a memorandum by

(2) to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter, except that no such employee benefit plan shall excuse the failure to hire any individual; or
   (3) to discharge or otherwise discipline an individual for good cause.

5. Section 10(a) of the Portal Act provides, in pertinent part, as follows:
   (a) In any action or proceeding based on any act or omission on or after May 14, 1947, no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938, as amended, ...

if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of [the Administrator of the Wage and Hour Division of the Department of Labor].... Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect.

The Portal Act is made applicable to alleged violations of the ADEA by ADEA § 7(e), 29 U.S.C. § 626(e)(1) (Supp. II 1978).

Quinn stated that "the lowering of normal retirement age to 62 should very favorably affect morale in terms of affording more years of retirement to look forward to and promoting more rapid turnover at the top." The proposed modifications of the Plan, including the lowering of the mandatory retirement age, were eventually adopted by Home's board of directors. No evidence was offered as to the substance of any discussion of the mandatory retirement age reduction at any meeting of Home's directors.

The Plan's modifications were first announced to Home's employees in a company newsletter. The article stated in pertinent part as follows:

The revised Retirement Program is not only advantageous to those approaching retirement but to all employees. Perhaps the biggest impact is in the retirement age which has been reduced to 62, offering full retirement benefits 3 years sooner. This feature will quicken the pace of promotional advancement within the company, offering qualified employees better career opportunities.

Thereafter Home circulated printed descriptions of the modifications of the Plan, stating in pertinent part as follows:

Full Pension at Age 62

Under the improved Plan, normal retirement (the mandatory retirement age) for both male and female employees will be age 62 for everyone under age 60 on January 1, 1974.

What's more, in the case of long service employees, the change in the Plan not only means a *full* pension *three years* sooner than now, but it also means a *bigger* pension than the Plan now pays at age 65.

If you are a young employee, this Plan change can create entirely new career opportunities for you. It will quicken the pace of promotional advancement for all those who can qualify to move into more demanding, better paying positions. And since pensions at The Home are based on "final average earnings," early career advancement can add substantially to your retirement income. Final average earnings are your average basic earnings for the highest consecutive *five years* out of the last 10 you work.

(Emphasis in original.)

The parties' stipulation also recited that Home "offered" various reasons for its decision to lower the normal and mandatory retirement ages. As set forth in the district court's opinion, Home's asserted reasons were

(1) "to remain competitive in the labor market;" (2) "to come into line with other subsidiaries of Home's parent, City Investing Company, each of which had age 62 as the normal retirement age," and with the parent company itself, ... plus three other reasons Home labels "compelling business reasons apart from the marketplace for amending the Plan," namely, (3) "improving employee morale, [(4)] ensuring that there would be trained successors for retiring employees, and [(5)] 'quicken[ing] the pace of promotional advancement for all those who can qualify to move into more demanding, better paying positions'...."

Slip op. at 3–4 (brackets in original). In support of these reasons Home proffered the affidavit and deposition testimony of Quinn, along with various documents and Home's answers to interrogatories. The EEOC neither endorsed the reasons advanced by Home nor accepted the truth of the statements contained in the proffered evidence.

## C. The Granting of Summary Judgment

The district court granted Home's motion for summary judgment and dismissed the complaint. It found that Home had two valid defenses to the action.

First, the court ruled that the reasons advanced by Home were not sham explanations for its decision to lower the normal retirement age. In particular, the court found that the desire to ensure adequate training for successors to the retirees was a plausible explanation for Home's decision to lower the mandatory retirement age in tandem with the normal retirement age. The court stated as follows:

According to Home, it had experienced a problem prior to the amendment in that employees would decide to retire on the spur of the moment, without grooming their successors adequately before leaving. Home says that given its other motivations to amend the plan so as to lower the normal retirement age, it was loath to institute a revised plan which would increase its vulnerability to this problem, by eradicating all financial incentive to work to the age of 65. By keeping the mandatory and normal retirement ages the same, and therefore lowering both the mandatory and normal retirement age to 62, it hoped to avoid aggravation of the preexisting problem and also to take steps toward reducing the original difficulties. Plaintiff has asserted that this reasoning makes no sense. However, we find Home's reasoning plausible. Since many of its employees were already retiring early, ... retirements that previously had occurred unpredictably between the ages of 62 and 65 presumably would now all occur at fixed predictable dates related to employees' sixty-second birthdays. Knowing the date in advance, the company could make sure the retiring employee began to groom a successor well in advance of his retirement.

We do not find in Home's reasons for lowering the normal and mandatory retirement age an intent to disadvantage older workers or evade the Act.... It is obvious that the amendment removed workers between the ages of 62 and 65 from the company's work force. However, we do not find here "a scheme ... or artifice of evasion" such as [*United Air Lines Inc. v. McMann*, 434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977)] indicates must be present for there to be a subterfuge under § 623(f)(2). *See* 434 U.S. at 203 [98 S.Ct. at 450].

We are not persuaded of the existence of a subterfuge by plaintiff's argument that with respect to ensuring trained successors and improving employee morale by speeding promotional advancement, there were other ways to achieve the same ends with less age-related impact.

Plaintiff has not specifically set forth any less detrimental alternatives which were available to defendant. A persuasive showing that there were at hand and known to the employer, or otherwise apparent, alternative solutions to the problem, would tend to show that the employer intended to evade the Act. *Cf.* [*EEOC v. Baltimore & Ohio R.R.*, 632 F.2d 1107 (4th Cir. 1980)] ("[m]anagement considered and rejected several alternatives," and subterfuge found). There has been no such showing here.

Slip op. at 10–12 (footnotes omitted; brackets added).

The second ground for the summary judgment was Home's Portal Act defense. Relying on *Addison v. Huron Stevedoring Corp.*, 204 F.2d 88 (2d Cir.), *cert. denied*, 346 U.S. 877, 74 S.Ct. 120, 98 L.Ed. 384 (1953), the district court found that Quinn's deposition adequately established that Home had relied in good faith on an interpretive ruling and two opinion letters of the Wage-Hour Administrator of the Department of Labor.

For the reasons below, we vacate the judgment in favor of Home and remand for such further proceedings as may be necessary.

## DISCUSSION

We commence with a review of well-established principles governing the granting of summary judgment. Summary judgment is improper unless there is "no genuine issue as to any material fact," and a party is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.' *Heyman v. Commerce & Industry Insurance Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975)." *American International Group, Inc. v. London American International Corp.*, 664 F.2d 348, at 350 (2d Cir. Nov. 13, 1981). "Not only must there be no genuine issue as to the evidentiary facts, but there must also be no controversy as to the inferences to be drawn from

them." *Schwabenbauer v. Board of Education*, 667 F.2d 305, at 313 (2d Cir. Dec. 17, 1981). In determining whether or not there is a genuine factual issue, the court should draw all reasonable inferences against the moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Schwabenbauer v. Board of Education, supra; Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980).

In light of the court's obligation to draw all reasonable inferences against the moving party, summary judgment is rarely appropriate where the moving party's state of mind is a material issue. *Schmidt v. McKay*, 555 F.2d 30, 37 (2d Cir. 1977); *Rodriguez v. Board of Education*, 620 F.2d 362 (2d Cir. 1980); *Croley v. Matson Navigation Co.*, 434 F.2d 73, 77 (5th Cir. 1970); 10 C. Wright & A. Miller, *Federal Practice and Procedure* § 2730 (1973). The inappropriateness of summary judgment when motive is in issue is not dispelled by the fact that summary judgment is sought by both sides. "The fact that both sides . . . sought summary judgment does not make it more readily available." *Home Insurance Co. v. Aetna Casualty & Surety Co.*, 528 F.2d 1388, 1390 (2d Cir. 1976). Rather, the court must evaluate each party's motion on its own merits, drawing, in each instance, all reasonable inferences against the party whose motion is under consideration. *Schwabenbauer v. Board of Education, supra.*

With these principles in mind, we conclude that the district court should not have entered summary judgment either on the ground that Home's lowering of the mandatory retirement age was not a subterfuge to evade the purposes of the ADEA, or on the ground that Home had proceeded in good faith within the meaning of the Portal Act.

### A. Subterfuge under the ADEA

At all pertinent times herein, § 4(a)(1) of the ADEA, which is set forth in full at note 3, *supra*, made it unlawful for an employer such as Home "to discharge any individual [whose age was over 40 and under 65] . . . because of such individual's age." [6] Section 4(f) of the Act, however, quoted in note 4, *supra*, provided certain exceptions. Section 4(f)(2) provided that it was not unlawful for an employer "to observe the terms of . . . any bona fide employee benefit plan such as a retirement . . . plan, which is not a subterfuge to evade the purposes of" the ADEA.

As the district court stated, the employer has the burden of proving that its age-based actions fall within the exception provided by § 4(f)(2). *EEOC v. Eastern Airlines, Inc.*, 645 F.2d 69 (5th Cir. 1981). *See generally* Belton, *Burdens of Pleading and Proof in Discrimination Cases: Toward a Theory of Procedural Justice*, 34 Vand.L. Rev. 1205, 1257–61 (1981). The § 4(f)(2) defense has three elements: (1) there must be a bona fide (retirement) plan, (2) the action must have been taken in observance of its terms, and (3) the retirement plan must not have been a subterfuge to evade the purposes of the ADEA. *E.g., EEOC v. Baltimore & Ohio R.R.*, 632 F.2d 1107, 1110 (4th Cir. 1980); *Smart v. Porter Paint Co.*, 630 F.2d 490, 493 (7th Cir. 1980).

The parties in the present case agree that the first two elements are established. They stipulated that the Plan, both before and after Home's 1974 amendments, was a bona fide plan within the meaning of the Act because Home employees who retired pursuant to its terms received substantial benefits; and they agreed that in requiring the prompt retirement of employees who

---

**6.** In 1978 the Act was amended in several respects. The 65 age limit was, effective January 1, 1979, increased to 70 for nonfederal employees and, effective September 30, 1978, eliminated entirely in covered federal employment. ADEA Amendments of 1978, Pub.L. 95–256 § 3(a), 92 Stat. 189 (amending 29 U.S.C. § 633a).

In addition, § 4(f)(2) was amended to add a prohibition against mandatory retirement ages:

"no such . . . employee benefit plan shall require or permit the involuntary retirement of any individual [covered by the Act] because of the age of such individual." ADEA Amendments of 1978, *supra*, § 2(a) (amending 29 U.S.C. § 623(f)(2)). The district court ruled that the 1978 Amendments were not retroactive and hence did not apply to Home's 1974 modification of its Plan. The EEOC has not contested this ruling on appeal.

reached the age of 62 after January 1, 1974,[7] Home was observing the terms of its bona fide Plan. The controversy centers on whether or not the plan was a subterfuge to evade the purposes of the Act. For the reasons below we conclude that there is no basis for ruling that Home's action was not subterfuge without making an examination of Home's motives for lowering the mandatory retirement age, and that a proper assessment of the evidence as to Home's alleged motives suggests that its action may well have been subterfuge.

Home contends that as a matter of law its Plan cannot be deemed a subterfuge (1) because it is a bona fide plan, paying substantial benefits, and (2) because the Plan included a mandatory retirement feature prior to the enactment of the ADEA. It purports to find support for these positions in the Supreme Court's decision in *United Air Lines, Inc. v. McMann*, 434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977). We think *McMann* requires their rejection.

In *McMann*, the Supreme Court addressed the meaning of the word "subterfuge" in § 4(f)(2) and the proof that, in the circumstances, the employer needed to offer as to that element. There, the plaintiff challenged the pension plan of United Air Lines ("United") which, with all its pertinent terms, had been established in 1941 and was construed to provide for mandatory retirement at age 60. McMann conceded that United's plan was "bona fide 'in the sense that it exist[ed] and pa[id] benefits,'" 434 U.S. at 194, 98 S.Ct. at 446, but contended, with the support of the Secretary of Labor as amicus curiae, that "enforcement of the age-60 retirement provision, even under a bona fide plan instituted in good faith in 1941, was a subterfuge to evade the Act," *id.* The court of appeals had ruled that "a pre-age-65 retirement falls within the meaning of 'subterfuge' unless the employer can show that the early retirement provision ... ha[s] some economic or business purpose other than arbitrary age dis-

crimination.' [*McMann v. United Air Lines, Inc.,*] 542 F.2d 217, 221 ([4th Cir.] 1976)." *Id.* at 195, 98 S.Ct. at 446 (brackets and ellipsis in original). The Supreme Court reversed, holding that where the plan was concededly bona fide, in the sense that substantial benefits were paid, and had been established decades before the enactment of the ADEA, it could not be deemed a subterfuge:

In this case, of course, our function is narrowly confined to discerning the meaning of the statutory language; we do not pass on the wisdom of fixed mandatory retirements at a particular age. So limited, we find nothing to indicate Congress intended wholesale invalidation of retirement plans instituted in good faith before its passage, or intended to require employers to bear the burden of showing a business or economic purpose to justify bona fide pre-existing plans as the Fourth Circuit concluded. In ordinary parlance, and in dictionary definitions as well, a subterfuge is a scheme, plan, stratagem, or artifice of evasion. In the context of this statute, "subterfuge" must be given its ordinary meaning and we must assume Congress intended it in that sense. So read, a plan established in 1941, if bona fide, as is conceded here, cannot be a subterfuge to evade an Act passed 26 years later. To spell out an intent in 1941 to evade a statutory requirement not enacted until 1967 attributes, at the very least, a remarkable prescience to the employer. We reject any such *per se* rule requiring an employer to show an economic or business purpose in order to satisfy the subterfuge language of the Act.

434 U.S. at 203, 98 S.Ct. at 450 (footnote omitted). The ruling in *McMann* does not purport to relieve all employers of all obligation to prove economic or business purposes in order to disprove subterfuge. Rather, the thrust of *McMann* is that where the plan is bona fide, in that it pays substantial benefits, and where the action tak-

---

7. The Plan had certain transitional provisions with respect to employees age 60 years or older on January 1, 1974.

en is in observance of its terms, the employer can meet its burden of proving that the plan is not a subterfuge simply by showing that it was established long before the ADEA was enacted. Where, however, the pertinent terms of the plan were adopted after the ADEA was enacted, this avenue of disproving subterfuge is simply not open. Proof by the employer of non-age-based reasons will then be required.

Home's argument that *McMann* warrants entry of judgment for Home as a matter of law appears to be based principally on the *McMann* Court's quotation of the following passage from *Zinger v. Blanchette*, 549 F.2d 901, 905 (3d Cir. 1977), *cert. denied*, 434 U.S. 1008, 98 S.Ct. 717, 54 L.Ed.2d 750 (1978):

> "The primary purpose of the Act is to prevent age discrimination in *hiring* and *discharging* workers. There is, however, a clear, measurable difference between outright discharge and retirement, a distinction that cannot be overlooked in analyzing the Act. While discharge without compensation is obviously undesirable, retirement on an adequate pension is generally regarded with favor. A careful examination of the legislative history demonstrates that, while cognizant of the disruptive effect retirement may have on individuals, Congress continued to regard retirement plans favorably and chose therefore to legislate only with respect to discharge." 549 F.2d at 905. (Emphasis supplied; footnote omitted.)

*McMann supra*, 434 U.S. at 198, 98 S.Ct. at 447. Emphasizing the last sentence in the *Zinger* quote,[8] Home argues here that the Court as well as the Congress favorably regarded retirement plans like Home's that paid substantial benefits, and decided that those plans could not be subterfuges to evade the Act's purposes whether they or amendments to them were adopted before or after the Act's effective date.

(Appellee's Brief at 30.) Neither the suggestion that a bona fide plan is ipso facto not a subterfuge, nor the suggestion that the time of adoption of the plan's pertinent terms[9] is irrelevant, can be supported. Taking these contentions in reverse order, we note first that neither *Zinger* nor *McMann* ruled on a plan whose pertinent provisions were adopted after the Act's effective date. Indeed, it is clear that the *McMann* majority relied heavily on the fact that United had set its mandatory retirement age at 60 prior to the enactment of the ADEA (the opinion referred to "plans instituted ... before its passage," 434 U.S. at 203, 98 S.Ct. at 450, and "pre-existing plans," *id.*), and concluded that United's plan so long predated the Act ("26 years," *id.*), that it could not rationally be considered to have been intended, in any normal sense, as a device to evade the Act. See also concurring opinion of Justice Stewart: "I think it is simply not possible for a bona fide retirement plan adopted long before the Act was even contemplated to be a 'subterfuge' to 'evade' either its terms or its purposes." *Id.* at 204, 98 S.Ct. at 450. Obviously no such impossibility inheres in an amendment that *follows* enactment of the Act.

8. Although the Court's purpose in quoting *Zinger* is not entirely clear, we note that the introduction to that quote was preceded by the observation that McMann had contended that § 4(f)(2) was not intended to authorize any involuntary retirement of an employee before the age of 65. 434 U.S. at 198, 98 S.Ct. at 447. We think it more likely than not that in that regard the Court found useful *Zinger*'s distinction between an employee discharge with no compensation and an employee retirement with pension. In any event, it is difficult to believe that the *McMann* Court was suggesting that it endorsed *Zinger*'s statement that Congress "chose ... to legislate only with respect to discharge," since the Court proceeded to explore the boundaries of Congress's legislation with respect to retirement plans.

9. Home's contention that its Plan cannot be considered a subterfuge because it contained a mandatory retirement feature (at age 65) prior to the enactment of the ADEA ("in 1974, Home simply continued the pre-Act mandatory retirement feature of its Plan while reducing the normal retirement age to 62" (Appellee's Brief at 32)) is frivolous. The mere fact that an employer had a pre-Act plan that arguably complied with the Act cannot validate the plan's post-Act modification to introduce new age-discriminatory terms.

Nor do we find tenable the proposition that no plan that is "bona fide" can be a "subterfuge." To assume that "bona fide" and "not a subterfuge" carry the same meaning is to ignore both the language and the stated purposes of Congress. If Congress had intended that a plan that is bona fide be considered ipso facto not a subterfuge, there would have been no reason for the insertion in § 4(f)(2) of the "not a subterfuge" clause. And in view of the purposes of Congress in enacting the ADEA, there is no basis for finding that clause redundant. If the meaning of the term "bona fide" is that stipulated by the parties in the present case, "bona fide" means simply that the plan pays substantial retirement benefits.[10] Equating "bona fide" with "not a subterfuge to evade the purposes of [the Act]" would thus require us to infer that the only purpose of the Act was to ensure the payment of substantial retirement benefits to older employees. Any such inference is repeatedly rebuffed by Congress's statements of its findings and purpose, 29 U.S.C. § 621, as well as by the legislative history of the Act. In § 621 Congress stated that older workers were disadvantaged in their efforts "to retain employment," § 621(a)(1), that the incidence of "unemployment" was detrimental to older workers' skill and morale, § 621(a)(3), and that older workers' "employment" problems were grave, id.; and it thus declared that a purpose of the ADEA was "to promote employment" of older persons, § 621(b). Likewise, the House of

Representatives Committee Report on the bill that became the ADEA, stated that the purpose of the bill was to promote the "employment" of older workers based on their ability, [1967] U.S.Code Cong. & Ad. News 2213, 2214; that the Secretary of Labor would be authorized to educate employers to achieve (1) the reduction of "barriers to . . . employment," (2) the promotion of "employment," and (3) the "expan[sion] [of] employment opportunities" for older workers, id. at 2216; and that "the [bill's] primary objective [was] the promotion of employment opportunities for older workers," id. at 2219. The suggestion that all the purposes of the Act would be served simply by retiring older workers and paying them pensions is thus squarely contradicted. Finally, we note that if the McMann Court had believed that a "bona fide" plan is ipso facto "not a subterfuge," it would have had no need to discuss what an employer must prove in order to establish that its bona fide plan is not a subterfuge.

Since, under the authorities, Home could not meet its burden of disproving subterfuge merely by showing the date of its Plan's pertinent amendments or by showing that the Plan pays substantial benefits, we conclude that it was incumbent on Home to prove valid business reasons for its action in lowering the mandatory retirement age,[11] and we turn now to an evaluation of the reasons Home has advanced.

Home's brief on appeal offers the following recapitulation:

**10.** This is the meaning conceded by the parties in McMann, 434 U.S. at 194, 98 S.Ct. at 446, and is the usual sense of the term "bona fide" as applied to such plans, see, e.g., Smart v. Porter Paint Co., supra, 630 F.2d at 494.

**11.** We have considered Home's other legal arguments and find them to be without merit. These include the contention that § 4(f)(2) cannot require proof of business purposes because business purposes are dealt with in §§ 4(f)(1) and 4(f)(3). There is obviously some overlap among the subsections, see note 4, supra, but not such as to relieve the employer of his explicit burden, in establishing a § 4(f)(2) defense, of disproving subterfuge. Subsection (1) relates in part to employment decisions based on a bona fide occupational qualification,

("BFOQ"), and to that extent there is overlap with subsection (2); but there may be valid business purposes not based on BFOQs. The other provisions of subsections (1) and (3) seem to have little relationship to a mandatory retirement age, for the act of retiring an employee because he or she has reached that age is neither an action based on a factor "other than age," § 4(f)(1), nor a discharge "for good cause," § 4(f)(3). An employer who invokes § 4(f)(2) is required to disprove subterfuge; and if an age-based discrimination was instituted after passage of the ADEA and the employer offers no reasonable business explanations for its institution, the court is compelled to draw the conclusion that the employer's action was subterfuge.

In 1974, Home had four legitimate business reasons for reducing the normal and mandatory retirement age under the Plan. First, Home wanted to remain competitive in the labor market. Second, Home wanted to keep in step with City Investing Company, and its other subsidiaries, each of which allowed employees to retire at age 62 without reduced benefits. Third, Home wanted to improve employee morale (a) by giving employees greater retirement benefits during more retirement years and, collaterally and secondarily, (b) by increasing promotional opportunities for all employees who could qualify for promotion. And fourth, Home wanted to ensure trained replacements for its many employees who were retiring early.

(Appellees' Brief at 34–35.) None of these reasons supports the entry of summary judgment in favor of Home.

Preliminarily, we note that although Home generally discusses the reductions of mandatory and normal retirement ages in tandem, the two are obviously different. Forcing an employee to retire at a given age is hardly the same as merely permitting him to do so. Only the forced retirements are under attack. With the difference clearly in focus, we see that most of Home's "reasons" have no application whatever to its lowering of the mandatory retirement age.

The first reason, "to remain competitive in the labor market," was properly found by the district court to be based on the Towers, Perrin report and recommendation. As the district court noted, Towers, Perrin found merely that other companies *allowed* their employees to retire with full pension benefits at age 62; it said nothing about other companies forcing such retirement and it did not recommend that Home lower its mandatory retirement age. We agree with the district court, therefore, that the first alleged reason "provides no support with respect to lowering the mandatory retirement age." Slip op. at 6.

The second reason, the desire to keep in step with affiliated companies, is similarly unrelated to the mandatory retirement age. Home tells us that its affiliates "allowed" employees to retire with full benefits at age 62. There is no suggestion that those employees were forced to retire at that age.

The third reason advanced by Home has two parts, and each part has a serious defect. In part (a), Home argues that it sought to improve employee morale by giving employees greater retirement benefits during more retirement years. This was, again, only a reason for reducing the normal retirement age. Reduction in the normal retirement age could indeed improve the morale of employees who wished to retire at age 62. But the lowering of the mandatory retirement age had no relevance to these employees. As a practical matter the lower mandatory retirement age affected only those employees whose morale it could not improve: those who wished to continue working past age 62. The argument that employee morale was to be improved by the longer period of retirement thus makes sense only with respect to the lowering of the normal, not the mandatory, age.[12]

In part (b) of its third reason, Home argues that it sought to improve employee morale by "increasing promotional opportunities for all employees who could qualify

---

**12.** The district judge evidently credited this argument of Home on the basis of an analysis that appears to have two flaws. First, the court noted that the EEOC questioned whether forced retirement of "employees who would have worked to 65" could have improved those employees' morale, but it rejected the EEOC's implicit challenge, stating that the EEOC "points us to nothing which would indicate whether the answer to this question was 'yes' or 'no'." Slip op. at 8. The burden, however, was not on the EEOC to prove a subterfuge but on Home to prove that its action was *not* subterfuge. That burden is not carried by the proffer of "reasons" that are illogical or explanations that are pretexts. The second problem in the court's acceptance of this argument as a basis for Home's action is an apparent failure to keep in focus the distinction between mandatory and permissive retirement. Thus, the court concluded that the EEOC "affords us no basis upon which to question the genuineness of this reason for lowering the *normal* retirement age." *Id.* (Emphasis added.)

for promotion." The defect in this reason results from the fact that as a result of the forced retirements at age 62, no employee between the ages of 62 and 65 could qualify for promotion. Hence the change was explicitly designed to increase promotional opportunities only for employees under the age of 62. And it can reasonably be inferred that Home's focus was on persons considerably under the age of 62, since its explanation sent to employees stated, "[i]f you are a young employee, this Plan change can create entirely new career opportunities for you." Thus, far from establishing as a matter of law that Home's action was *not* a subterfuge to evade the purposes of the Act, this "reason" plainly indicates that it may very well have been Home's intent to eliminate older workers in favor of younger ones, a conclusion that would require the entry of judgment against Home. As to this alleged reason, the district court stated as follows:

> though this change may have had greater appeal for younger workers and been directed more at them, we do not find a basis here for concluding that Home's motivation in amending the plan was to advantage younger workers at the expense of older ones.

Slip op. at 10. We think that in light of the present record this conclusion could be questioned even if it were a ruling after a trial on the merits. But certainly in the context of a motion by Home for summary judgment, the inference should have been drawn from Home's preclusion of the advancement of workers aged 62–65, from its total elimination of such workers from its employ, and from its explicit appeal to the "young," that Home's motivation was to advantage younger workers at the expense of older ones.

Finally, Home's "fourth" reason, "to ensure trained replacements for its many employees who were retiring early," cannot support summary judgment in Home's favor. Given all the circumstances, this explanation, which Home claims was its primary reason for reducing the mandatory retirement age, appears to be specious. First, we note that Home did not eliminate early retirements; prior to the 1974 amendments employees could retire as early as age 55; after the amendments they could retire just as early. Second, although Home could reasonably have feared that a mandatory retirement age of 65 while retirement with full benefits was permissible at age 62 would lead a number of persons between the ages of 62 and 65 to take early retirement, the appeal of this argument is lessened by the fact that most of Home's early retirees apparently were not in the 62–65 age bracket. Quinn emphasized in his deposition that before 1974 "a lot" of Home employees had retired at age 60 or 61; and it was stipulated that in that period, *i.e.*, when Home's mandatory and normal retirement ages were 65, the average age of early retirees was under 62. Thus, the lowering of the mandatory retirement age to 62 would hardly produce greater predictability in the retirement dates of the bulk of the early retirees; they were leaving Home before age 62. Third, for every age bracket of early retirement, Home's 1974 amendments increased the percentage of pension benefits payable to the early retiree. Thus, early retirements became not less attractive, but more attractive; they were likely not to decrease, but to increase. And this, indeed, was precisely what Home intended. Quinn's memorandum to the chairman of Home's board of directors stated that the early retirement penalties for employees 58–61 years old were decreased in order to encourage early retirement:

> "Under this schedule the penalty for early retirement at ages 58 through 61 would be significantly reduced from the present and the [Retirement] Committee feels that this is consistent with its objective of promoting turnover."

And yet, in the face of its greater encouragement of early retirements, Home apparently did nothing to achieve what it claims was the primary goal of the mandatory retirement feature, *i.e.*, ensuring trained replacements for early retirees. It could probably have achieved this goal by requiring that those electing to retire early give

the company adequate notice to permit a successor to be found or trained. But it could have done this regardless of whether the mandatory and normal retirement ages were the same. Perhaps it is not insignificant that in no Home document discussing the lowering of the retirement ages is there any mention of spontaneous early retirements as a problem. We conclude that Home's failure to take any steps to require advance notice of early retirement or to assure training of successors for early retirees casts doubt upon the verity of spontaneous early retirements as a reason for lowering the mandatory retirement age. Home's action to encourage early retirements and its failure to take any steps to eliminate their spontaneity suggest that the "problem" was of little real concern and that the "reason" is pretext.[13]

■ In sum, Home has offered a total of five reasons for its lowering of the mandatory retirement age, in an effort to carry its burden of proving that its action was not subterfuge for age discrimination. Three of the alleged reasons had no relationship whatever to the mandatory age. One, billed as Home's "primary" reason, *i.e.*, coping with spontaneous early retirements, appears to be specious. And one reason, which appears to amount to no more than a desire to increase opportunities for the young, would, if proved a motivating factor, justify entry of judgment against Home. Summary judgment in Home's favor should not have been granted on its § 4(f)(2) defense.

### B. *Good Faith Conformity under the Portal Act*

■ The Portal Act was designed to protect employers from liability if they took certain actions on the basis of an interpretation of the law by a government agency, even if the agency's interpretation later turned out to be wrong. 29 U.S.C. § 259

(1976). Section 10(a) of the Portal Act, the text of which is set out in pertinent part at note 5, *supra*, provides that "an employer shall not be subject to any liability . . . if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on" a written ruling or interpretation of an appropriate government officer, here, the Wage-Hour Administrator. Thus the Portal Act defense requires the employer to establish three interrelated elements: (1) that its action was taken in reliance on a ruling of the Administrator, (2) that it was in conformity with that ruling, and (3) that it was in good faith.

■ Home asserts that in lowering the mandatory retirement age to 62 in 1974 it relied on two published opinion letters and a published regulation of the Wage-Hour Administrator. The first such letter, dated September 6, 1968 ("1968 letter"), stated as follows:

The lowering of the retirement age from 65 to 62 years for employees participating in a bona fide retirement plan would not affect the applicability of provisions authorizing retirement irrespective of age pursuant to retirement or pension plans, *provided such plans are not a subterfuge to evade the purposes of the Act.* The statutory exception would not apply to the involuntary retirement before age 65 of employees who are not participants in a retirement plan.

This is in further reference to your letter concerning the application of the Age Discrimination in Employment Act to a retirement program which is being considered by one of your clients.

The lowering of the retirement age from 65 to 62 years for those employees participating in a bona fide retirement plan would not affect the applicability of the exception specified in section 4(f)(2)

---

**13.** Here again the district court may have erroneously allocated the burden of proof to the EEOC, stating that

Plaintiff has not specifically set forth any less detrimental alternatives which were available to defendant. A persuasive showing that

there were at hand and known to the employer, or otherwise apparent, alternative solutions to the problem, would tend to show that the employer intended to evade the Act. Slip op. at 12 (footnote and citation omitted).

of the Act. Section 4(f)(2) authorizes involuntary retirement irrespective of age, *provided that such retirement is pursuant to the terms of a retirement or pension benefit plan meeting the requirements of the statute.*

The exception set forth in section 4(f)(2) of the [A]ct would not apply, however, to the involuntary retirement before age 65 of employees who are not participants in your client's retirement plan.

Empl. Prac. Guide (CCH) ¶ 18,045 (1968) (emphasis added). The second letter, dated June 29, 1971 ("1971 letter"), was similar, and stated in pertinent part as follows:

Exception to the statutory ban on age discrimination allowed bona fide employee benefit plans pertains to a plan that is established in good faith to provide certain fringe benefits for employees, *and not as a device to avoid application of the law.*

This is in further reference to your letter of April 28, 1971, concerning the application of the Age Discrimination in Employment Act to bona fide employee benefit plans. We regret the delay in responding to your inquiry.

In this connection, the term "bona fide", given its generally understood meaning, describes a plan established in good faith to provide certain fringe benefits for employees, *and not as a device or subterfuge to avoid the purposes of the Act.*

Section 4(f)(2) has not, up to this date, been litigated in the courts.

*Id.* ¶ 18,103 (1971) (emphasis added). The regulation, published on June 21, 1969 ("1969 regulation"), stated, in pertinent part, as follows:

(a) Section 4(f)(2) of the Act provides that "It shall not be unlawful for an employer, employment agency, or labor organization * * * to observe the terms of * * * any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this Act, except that no such employee benefit plan shall

excuse the failure to hire any individual * * *." Thus, the Act authorizes involuntary retirement irrespective of age, *provided that such retirement is pursuant to the terms of a retirement or pension plan meeting the requirements of section 4(f)(2).*

29 C.F.R. § 860.110(a) (ellipses in original; emphasis added).

Quinn testified at his deposition that he had consulted these opinion letters and the regulation prior to Home's lowering of the mandatory retirement age, and that he had believed Home's action would be in conformity with these rulings:

A . . . I am further aware that I came to know of two or three rulings which seemed to be on all four [*sic*]; one which lowered it from 65 to 62, as we were doing, provided we had a bona fide plan that was not a su[b]terfuge. And I was satisfied, as counsel, that we met these tests.

    \*     \*     \*     \*     \*     \*

Q Mr. Quinn, is it your testimony that in concluding that it was legally proper to reduce the retirement age, that you, in fact, back in 1973, relied on the opinions and regulations that have been handed you here today?

A Yes. The opinions and regulations that construes [*sic*] the section, 4F2 Section.

The district court accepted Home's contention that it was thus entitled to judgment as a matter of law on the basis of § 10 of the Portal Act. We think none of the three elements required for the defense has been proven.

First, the action of the employer, for which it seeks to escape liability by virtue of the Portal Act, must have been taken in reliance on the administrative ruling or interpretation. We think that neither the letters nor the regulation gave any sort of interpretive guidance, relative to Home's proposed action, on which Home could rely within the meaning of the Portal Act. As the italicized portions of the letters and regulation, quoted above, demonstrate, the

thrust of the Administrator's statement in each instance was that the retirement of employees on the basis of age pursuant to a bona fide retirement plan would not violate the ADEA, so long as the plan was not a subterfuge or a device to evade the Act. See 1968 letter ("provided such plans are not a subterfuge to evade the purposes of the Act"; "provided that such retirement is pursuant to the terms of a retirement or pension benefit plan meeting the requirements of the Statute"); 1971 letter ("and not as a device to avoid application of the law"; "and not as a device or subterfuge to avoid the purposes of the Act"); 1969 regulation ("provided that such retirement is pursuant to the terms of a retirement or pension plan meeting the requirements of section 4(f)(2)"). None of the Administrator's statements contained any elaboration of what does or does not constitute subterfuge. In essence, each stated that an employer would comply with the Act if it complied with § 4(f)(2). They thus gave Home no guidance on which to rely to know whether or not its own reduction of the mandatory retirement age constituted subterfuge. In effect Home was left to its own devices to interpret the Act. But as stated in President Truman's message to Congress on his signing of the Portal Act, § 10 was not intended to "make each employer his own judge of whether or not he has been guilty of a violation." Message of President Truman to accompany the Portal-to-Portal Act of 1947, [1947] U.S.Code Cong. & Ad.News 1827 (May 14, 1947).[14]

Next, assuming that as a technical matter Home could have relied on the letters and regulation, its action must have been "in conformity with" the ruling or interpretation. Since the letters and regulation stated that whatever was to be done must not be subterfuge, in order to establish a Portal Act defense Home must prove that its reduction of the mandatory retirement age was not subterfuge. As we have indicated in Part A above, Home's alleged reasons for its reduction of the mandatory retirement age not only fail to disprove subterfuge as a matter of law, they would support an inference that its action was in fact subterfuge. Thus the question of Home's conformity with the "ruling" that its act must not be subterfuge is similarly unresolved. This, of course, highlights the jejunity of a Portal Act defense when the "interpretation" purportedly relied on has done no more than repeat the requirements of the statute: if the employer has acted "in conformity with" the interpretation he will have obeyed the statute, and the Portal Act defense will be available only when the employer does not need it.

The final element that an employer must establish in order to prove a Portal Act defense is that its conformance with the administrative ruling or interpretation was in good faith. This is not a requirement of a showing of general good faith; the Portal Act language, "in good faith in conformity with," precisely links the question of good faith to an act in conformity, and if there is no conformity, general good faith in other respects cannot save the day. The interrelationship among the elements was described in the President's message to Congress:

> I wish also to refer to the so-called "good faith" provisions of Sections 9 and 10 of the Act. It has been said that they make each employer his own judge of whether or not he has been guilty of a violation. It seems to me that this view fails to take into account the safeguards which are contained in these Sections. The employer must meet an objective test of actual conformity with an administrative ruling or policy. If the employer avails himself of the defense under these Sections, he must bear the burden of

---

14. See also discussion of the Portal Act's legislative history in Clifton D. Mayhew, Inc. v. Wirtz, 413 F.2d 658, 661 (4th Cir. 1969):
    "The defense of good faith is intended to apply only where an employer innocently and to his detriment, followed the law as it was laid down to him by government agencies, without notice that such interpretations were claimed to be erroneous or invalid. It is not intended that this defense shall apply where an employer had knowledge of conflicting rules and chose to act in accordance with the one most favorable to him." Vol. 93, Part 4, Cong.Rec. 4390.

proof. He must show that there was affirmative action by an administrative agency and that he relied upon and conformed with such action. He must show further that he acted in good faith in relying upon that administrative action. *Id.*

Two conclusions follow from the fact that these elements are so intertwined. First, the serious questions that we have discussed as to whether or not Home's action was in conformity with the "interpretation" that its action must not be subterfuge necessarily leave the question of Home's pertinent good faith unresolved. Second, the district court's interpretation, in reliance on dicta from *Addison v. Huron Stevedoring Corp., supra,*[15] of the precise contours of the good faith defense requirement is flawed. The district court relied on *Addison* for the proposition that all that is required is that the employer have evinced an " 'honest intention to ascertain what the ... Act requires and to act in accordance with it.' " Slip op. at 15, quoting *Addison,* 204 F.2d at 93. We believe the Portal Act requires more.

The circumstances in *Addison* were materially different from those of the present case. In *Addison,* the agency advice was specific and left no room for interpretation. *See* district court opinion in *Addison,* 96 F.Supp. 142, 159 (S.D.N.Y.1950). Hence, the *Addison* court's dicta stating that only subjective good faith, rather than reasonable grounds for belief, need be shown, had greater validity there, where the employer was not left to its own devices. In the circumstances here, we believe the "honest intention to ascertain" is not sufficient to establish good faith within the meaning of the Portal Act. An employer may well make an honest effort to become informed as to the precise requirements of the Act; and even if the only information made available to it is a haec-verba repetition of

the terms of the statute, its intention was no less honest. But where the administrative interpretation is uninformative and leaves the employer to make its own reading of the precise requirements of the statute, the employer's honest, but unsuccessful, intention to obtain information does not relieve it of liability.

In short, the Portal Act was not intended to allow an employer to insulate itself from liability for the consequences of its own improvident interpretation of the statute. In the circumstances of the present case, Home has not established a Portal Act defense.

## CONCLUSION

The judgment is vacated and the case is remanded for such further proceedings as may be necessary.

---

**15.** *Addison* construed § 9 of the Portal Act, 29 U.S.C. § 258 (1976), which contains the same pertinent language ("in good faith in conformity with and in reliance on") as § 10. Section 9 applies to acts or omissions prior to May 14, 1947, whereas § 10 applies to acts or omissions

on or after that date. *Addison*'s discussion of the test of good faith was, as that court noted, dictum, since the district court had found that the defendant met an objective standard of good faith. 204 F.2d at 92.