Lancelot THEOBALD, Plaintiff,

v.

BOTEIN, HAYS, SKLAR &
HERZBERG, Defendant.

No. 78 Civ. 850.

United States District Court,
S. D. New York.

March 6, 1979.

J. A. Rivera, Brooklyn, N. Y., for plaintiff.

Botein, Hays, Sklar & Herzberg, New York City, for defendant.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

Defendant partnership, by motion docketed December 1, 1978, seeks summary judgment in its favor pursuant to Rule 56, F.R. Civ.P., and alternatively, to strike the demand for a jury, in this action brought pursuant to Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e, et seq.), and the Civil Rights Act of 1866, as amended (42 U.S.C. § 1981).

Defendant is a distinguished law firm with a long and honored history at the bar in this City. Its liberal credentials are outstanding, and require no recital by this Court. Plaintiff, a black man, asserts that after some 18 years of employment he was fired on a pretext because of his race. Initially, plaintiff also sued Jane Foley, an Office Manager employed by defendant. Ms. Foley died in July 1978, and the action against her was dismissed by the Court with plaintiff's consent.

Understandably vexed by this attack on their character and integrity, the partners in the defendant law firm (hereinafter for convenience the "Botein firm") have, following the completion of considerable pretrial discovery, sought summary judgment terminating this litigation without trial. Defendant law firm asserts that there is no genuine issue as to any material fact, that plaintiff was not discriminated against, by race or any other reason, and it is entitled to judgment as a matter of law. Alternatively, defendant suggests that the Title VII claim, the § 1981 claim and the pendent state law claim pleaded are all time barred.

Initially plaintiff filed charges with the New York State Division of Human Rights, on July 24, 1976, against the Botein firm and Ms. Foley, claiming that his employment with defendant was terminated because of his race. The New York State Division of Human Rights determined on January 20, 1977 that there was no "probable cause" to believe that defendant engaged in the discriminatory practice complained of, and also held that "the record as a whole doesn't support the complainant's allegations that he was terminated because of his race or color."

■ This determination, while not controlling in this case, is admissible in evidence at trial or on this motion under Rule 803(8)(C), F.R.Evid. Plaintiff appealed, and the State Division of Human Rights requested a remand solely because plaintiff claimed he had not seen certain papers filed in the proceeding by defendant. The Appeal Board on March 16, 1978 remanded the proceedings to the State Division for further action, and nothing has been done since then.

On November 10, 1977, defendant was notified by the Equal Employment Opportunity Commission ("EEOC") that the State complaint filed by Theobald constituted an EEOC charge, and that the EEOC, which was then in possession of the entire State Division file on the matter, intended to conduct its own investigation. On November 23, 1977, the EEOC also concluded that there was no reasonable cause to believe that the allegations of discrimination were true, and it dismissed the charges. This determination although not binding is also entitled to some evidentiary value.

The background facts are not in dispute. Plaintiff was hired by the predecessor partnership of the Botein firm in April 1961 as a multilith operator and assistant file clerk. In 1964 he became a full-time multilith operator, was relieved of all filing responsibilities, and on occasion was assigned to operate the Xerox machine.

In early 1969, the Honorable Bernard Botein, a distinguished Justice of the New York Supreme Court who had served on the Appellate Division in the First Judicial Department, retired pursuant to statutory mandate, by reason of his age. He joined the law firm. Plaintiff was offered and accepted the position of chauffeur for Judge Botein, who did not drive his own

car. Following Judge Botein's death in 1974, the defendant law firm no longer had need of a chauffeur. To preserve plaintiff's employment, the law firm created a position of "Supervisor of Messengers and Mail." In May 1975, finding that this position, which had been created to avoid terminating Theobald's long standing employment with its office, was unnecessary, defendant transferred plaintiff to the file room, eliminating the position. Theobald conceded on his deposition that he refused supervisory responsibilities in the file room, and also that he was not the only black person employed by the Botein firm.

During his long employment with the defendant's office, plaintiff received promotions, regular yearly increases in salary, and bonuses. By the time he was terminated he was earning $251.00 per week, a substantial salary for a file clerk.

Theobald conceded at his deposition that apart from his discharge, the firm never discriminated against him. Undisputed testimony shows that long before Ms. Foley was hired by the law firm as an office manager, various partners had complained to the managing partner about the operation of the file room, and about plaintiff's activities in particular. Finding it hard to undergo the transition from having been the valued chauffeur of a prominent retired judge practicing law successfully, plaintiff clearly had difficulty readjusting to the tedious work of law office filing. Testimony shows that he spent excessive amounts of time on the telephone, showed a lack of concern for the work of the file room which he seemed to feel was beneath him, and had a negative attitude toward the firm, loafing on the job and spending an inordinate amount of time in conversation in the hall.

During most of this time, Theobald was moonlighting. He had a full-time night shift job with the City of New York as a guard. On many days he found it necessary to leave his job with the City to go directly to work at Botein's office, stopping only for breakfast. He worked a night shift for the City varying from 11:00 P.M. to 7:00 A.M., or Midnight to 8:00 A.M. If,

as charged, his work in the file room was lackadaisical, it could be attributed to fatigue. His moonlighting, however, was concealed from the Botein firm. During most of this time plaintiff's wife was employed as a registered nurse. When fired by defendant, plaintiff continued his job with the City of New York, shifting to days. He was also actively engaged as a landlord of residential property, while working on both jobs. In this latter activity and other matters, plaintiff received free legal representation from the Botein firm.

Ms. Foley, who was deposed prior to her death, testified that prior to her employment she had been told that the file room was one of the problems she would encounter on assuming the position of office manager. She received complaints from many attorneys, and testified that following her employment, she examined and observed the operations of the file room. She found that the file room was unstructured, files scattered throughout the office, and no record kept of where they could be found. There was a backlog of loose, unfiled and unsorted papers that had not been placed in the appropriate folders. The proper operation of a file room is essential to the conduct of a law office. The loss of a paper or its misfiling in a file of similar name or number can cause untoward difficulties, and may even result in malpractice claims against attorneys or loss of rights by clients.

Theobald testified, p. 23, that he had no conversations with any partner in the firm after he had been notified that he had been terminated. He did not complain to any of the partners, nor did he complain to Ms. Kelly or Mr. Williams, who were above him in the chain of command for non-professional employees of the defendant law firm. Plaintiff admitted that he was asked by Ms. Foley whether he would be interested in going to school to become a para-legal, or whether he would be interested in doing any work other than filing. The only other conversations plaintiff had with Ms. Foley between the date of her retention as office manager and the date of his termination

were conversations concerning the abuse of the telephone in the file room, the practice of eating in the file room, which plaintiff discontinued at her request, and a request that he have jury duty postponed, which request plaintiff complied with reluctantly and after discussion. Plaintiff did not testify to, nor does he present any evidence of any acrimony whatever with Ms. Foley, or with any of the partners or persons in position of authority at the defendant law firm. He presents no hard evidence from which the inference could be drawn that there was any discrimination against him whatsoever, on racial grounds or otherwise. He said he had only one conversation with Ms. Foley about the backlog of work in the file room, and that Ms. Foley had given him 60 days to clear up the file room. He conceded that he never complained to any partner of the firm about Ms. Foley during the period she was employed there, and never complained to Ms. Kelly. He conceded that once during the lifetime of Judge Botein he had protested because his Christmas bonus had not been increased over the prior year, and as a result of his protest he received the additional sum of money to which he regarded himself entitled.

Because we cannot resolve credibility on motion papers, the Court has relied primarily on Theobald's own testimony. As noted, it shows no basis for the conclusion that after these long years of favorable relationship, plaintiff was discriminated against by anybody associated with defendants, on grounds of race or otherwise. For verification of this conclusion we turn to the opposing evidence proffered by the defendant.

Arnold Chase, a member of the defendant firm, first employed there in 1964, was the associate managing partner since about 1975. He testified that he supervised the usual succession of office managers. Chase testified that he had conversations with various partners who made complaints about the file room and Mr. Theobald in particular. These complaints included contentions that Theobald seemed to be spending an excessive amount of time on the telephone in the file room, so that people could not get through to the file room to

request files, that he was evidencing a lack of concern for the work, and that his attitude was such that he seemed to believe that the work was below his capabilities, and that he seemed to have a negative attitude towards the firm. There were complaints also received by Chase that Theobald was spending an inordinate amount of time chatting in the halls with secretaries and other personnel rather than getting his work done. While Chase had no recollection of doing so, he ordinarily would pass on such complaints to the office manager. This testimony is of significance because it shows a dissatisfaction on the part of the working lawyers in the office prior to the time that Ms. Foley was hired. When Ms. Foley was retained, the status of the file room was one of many subjects discussed with her by Chase in connection with her employment. He pointed out that there were problems getting materials filed and having files organized in such a way that material would be readily available to any attorney who wanted it.

Thereafter Ms. Foley reported to Chase that she "did not think that Theobald was holding up his end of the work in the file room." Thereafter it was reported to Chase that plaintiff's work performance had not improved. In mid-April, Ms. Foley reported to Chase that there had been no improvement in Theobald's work, that the problems in the file room were not being corrected, and they "simply decided that it was time to end the relationship with Mr. Theobald." Chase testified that "it was a decision that I arrived at, based on the reports that I had received, and also based on what by that time I had the opinions that I had formed," (p. 35) "which was that Mr. Theobald did not seem very interested any more in working for us. It appeared to me that he seemed to be, so to speak, walking around the office with a chip on his shoulder and that he simply wasn't doing his job." He instructed Ms. Foley, if possible, to replace Mr. Theobald with someone who had more experience in a file room (p. 37). Thereafter, with a new employee associated with Mr. Williams, the "backlog

problem was cleared up rather quickly to the satisfaction of everybody in the firm."

The other depositions taken are consistent with the testimony of Chase and Foley. In effect, the pre-trial discovery in this case is as extensive as the proof ordinarily elicited at trial. Plaintiff was deposed on parts of four separate days. The Court has read his testimony. Putting aside any issue of credibility, Theobald's testimony, if given at trial, is insufficient to survive a motion by defendant for a directed verdict made at the close of plaintiff's case. Indeed, Theobald's own testimony proves that no reasonable juror acting reasonably, could find the Botein firm guilty of the charges made against it here.

Theobald testified that he is now almost 40 years old, and finished high school. After one or two minor jobs of an unskilled nature in the textile and clothing industry, and work loading and unloading trucks, he began in 1961, at the age of 22 years, as a multilith operator and file clerk at the predecessor firm of defendant. Later he became a full-time xerox and multilith operator, and when the late Judge Botein joined the law firm after Theobald had been employed there for about eight years, according to his testimony, he became the chauffeur for Judge Botein in connection with his work. When not actually engaged as a chauffeur, he would attend to the petty cash entries, mailing and other ministerial functions in the law office. In about 1974, according to Theobald, when Judge Botein died, he worked on the "client ledger books" recording disbursements and charges against clients. About six months later, he was made supervisor of special services, as a dispatcher, messenger. He describes the duties as consisting of being a dispatcher, messenger, seeing that the mail got out, issuing petty cash and submitting records for special services chargeable to clients at the end of the month. He supervised five messengers and one mail clerk and a xerox operator. About a year later he was made a file clerk. He testified that he received regular salary increases during his lengthy employment with the Botein firm, and that there were several other black persons employed in the office at various jobs. He testified that on April 30, 1976 Ms. Foley terminated his employment by calling him into her office, and explaining that the reason the firm had decided to let him go was "reorganization." He received six weeks severance pay, and four weeks vacation pay.

■ The Court has discussed the details of Theobald's claims in greater detail because of an awareness that summary judgment is rarely granted in civil rights cases. See *Judge v. City of Buffalo*, 524 F.2d 1321 (2d Cir. 1975); *Egelston v. State University College at Geneseo*, 535 F.2d 752 (2d Cir. 1976). However, in *SEC v. Research Automation Corp.*, 585 F.2d 31 (2d Cir. 1978), our Court of Appeals made clear that when a motion for summary judgment is supported by depositions and affidavits, the party opposing the motion may not rest upon mere conclusory allegations or denials. As stated in *Research Automation, supra* (p. 33):

"The party opposing the motion must set forth 'concrete particulars' *Dressler v. The MV Sandpiper*, 331 F.2d 130, 133 (2d Cir. 1964), and cannot make a secret of his evidence, holding it close to his chest until the trial. *See Donnelly v. Guion*, 467 F.2d 290, 291 (2d Cir. 1972). It is not sufficient merely to assert a conclusion without supplying supporting arguments or facts in opposition to the motion. *Id.*, at 293. *See Applegate v. Top Associates, Inc.*, 425 F.2d 92, 96 (2d Cir. 1970)."

\* \* \* \* \* \*

[T]he policy favoring efficient resolution of disputes, which is the cornerstone of the summary judgment procedure, would be completely undermined if unsubstantiated assertions were sufficient to compel a trial."

■ Plaintiff bears the burdens of proof and persuasion in an employment discrimination case. *McDonald v. Sante Fe Trail Transp. Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). In *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court held that plaintiff bears the

initial burden of establishing a *prima facie* case of racial discrimination. Only then does the burden of going forward shift to defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell-Douglas Corp., supra,* at 802, 93 S.Ct. at 1824. The burden of persuasion then shifts back to plaintiff to prove that the reason stated by defendant was mere pretext to conceal a bad motive. As noted before, applying these standards, it is clear on the extensive pre-trial record that plaintiff will not be able to make out a *prima facie* case; and assuming he can, defendant shows a legitimate non-discriminatory reason for terminating plaintiff, which is clearly not a pretext. There is no genuine issue of material fact on any of these points.

It was never the intention of Title VII to prevent the reorganization of an ineffectual section or department of an employer's plant or office, nor to prevent discharge of a lackadaisical or disinterested worker by an equal opportunity employer, simply because such action might affect a minority employee adversely. The important goals of fair hiring and fair employment will not be advanced by forcing unsubstantiated cases to trial, at great cost, and we should not do so when it becomes clear on a motion for summary judgment that the case can have but one outcome.

 We consider in passing the alternate grounds asserted with respect to failure by plaintiff to file this action within the time permitted by law. Plaintiff's original complaint *admits* that he received the notice of right to sue on November 25, 1977. This case was filed February 24, 1978, 91 days later. Timely filing is a jurisdictional pre-requisite. Plaintiff now, and at his deposition, asserts under oath that this was incorrect, an "ambiguity of dates" [Affidavit of plaintiff docketed January 22, 1979, ¶ 63.] He now says he "Doesn't know" when he received the letter. He denies he signed the certified mail receipt. Since Thursday, November 24, 1977 was a holiday (Thanksgiving Day) and the mailing was November 23rd, it is possible that his origi-

nal statement of receipt of the Notice on November 25th is in error. In any event, this does raise an issue of credibility which should not be resolved on motion. The disposition of this motion may not rest on the claim of late filing.

Defendant also suggests that the § 1981 claim is barred by statute of limitations. I agree. The analogous state cause of action is found in New York Executive Law §§ 290, *et seq.,* as to which a one-year statute of limitations applies by reason of § 297(5) of that statute. This statute of limitations also bars the pendent state claim pleaded.

Summary judgment is granted. Submit a form of final judgment directly to the Judgment Clerk, Room 16.

So ordered.