James K.J. CHENG, Plaintiff,

v.

GAF CORPORATION, Defendant.

No. 77 Civ. 3159.

United States District Court,
S.D. New York.

Oct. 14, 1982.

Legal Service for the Elderly Poor, New York City, for plaintiff; Jonathan A. Weiss, New York City, of counsel.

Epstein, Becker, Borsody & Green, P.C., New York City, for defendant; Robert L. Jauvtis, New York City, of counsel.

## OPINION AND ORDER

OWEN, District Judge.

Before me are three motions by defendant GAF Corporation. In the first, GAF seeks to amend its answer to assert that the various applicable statutes of limitations bar all of plaintiff's claims. In the second, GAF seeks summary judgment pursuant to Rule 56 as to various aspects of plaintiff's claims in this discrimination action. GAF's third motion is for attorney's fees and costs pursuant to 28 U.S.C. § 1927 for allegedly frivolous proceedings by the plaintiff in the United States Supreme Court, the Court of Appeals, and this Court following an adverse ruling in the Supreme Court.

GAF's motion to amend its answer is addressed to the Court's discretion and is granted. I do note, however, that to the extent that new issues are raised by the amendment, some appear to have been ruled upon herein.

Turning next to the motion for summary judgment, I will draw the facts from those which the parties do not dispute and from plaintiff's statement of the disputed facts. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Plaintiff, James K.J. Cheng, is a Chinese-born, naturalized citizen of the Oriental race. In July, 1962, he was hired as a Senior Research Chemist by GAF Corporation. On June 30, 1975, he was forced into involuntary retirement at the age of 61. Plaintiff alleges that the following course of conduct culminated in his termination.

On June 13, 1975, Mr. Francis W. Gaube, the GAF personnel manager at the plant where plaintiff was employed, informed plaintiff that he would have to either accept a demotion to the lower paying job of lab technician or choose to retire early pursuant to GAF's early retirement plan. Because a demotion would have been accompanied both by a $5,672 pay cut and by personal and professional humiliation, plaintiff refused to accept a new position as a lab technician. Consequently, Mr. Gaube then informed plaintiff that his employment at GAF would be terminated as of June 30, 1977. At or after that date, the responsibility for completing plaintiff's projects at GAF fell to a 27 year-old employee of the corporation.

Plaintiff further alleges that his termination was part of plaintiff's ongoing practice of discriminating against him and other Oriental individuals because of their race. In plaintiff's case this discrimination took various forms. At five different times, plaintiff claims, he was passed over for a promotion to the vacant position of supervisor. Each time a less experienced Caucasian individual was appointed. Moreover, plaintiff was never considered for a position as a group leader although he was qualified for that position as well. At other times, plaintiff was denied publicity and credit for work he had done, was refused the assignment of a parking place, and was disparaged to his co-workers by his superiors. More generally, plaintiff avers that GAF has systematically paid its Oriental workers less than it has paid non-Oriental employees and has systematically denied Orientals both salary raises and promotions.

Defendant GAF, on the other hand, tells a different story. Francis W. Gaube states

that in the spring of 1975, GAF instituted a cost reduction program occasioned by a generally poor economic climate. Part of that program anticipated a reduction in personnel. Thus, managerial personnel were instructed to give him lists of names of "surplus" employees. Gaube then reviewed the personnel record of each individual on the list and determined whether that individual could be relocated within the corporation or whether they should be offered early retirement. Dr. Michael T. Schiraldi, the group leader in charge of plaintiff's unit, included Mr. Cheng on his "surplus" list. Faced with Dr. Schiraldi's recommendation, Mr. Gaube presented the situation to plaintiff and offered either to demote plaintiff to a position as a lab technician and to reduce his salary from $19,400 to $13,728 or to grant plaintiff early retirement status. In late June of 1975, Mr. Gaube states, plaintiff told him that he would accept early retirement.

■ While acknowledging these conflicting facts, defendant poses a number of legal issues which it asserts requires complete or partial summary judgment. First, noting that plaintiff's first claim for relief alleges that defendant, by compelling plaintiff to accept early retirement, violated § 623(a)(1) of the Age Discrimination in Employment Act ("ADEA") because it discriminated against him on the basis of his age,[1] GAF nevertheless contends that plaintiff's early retirement fell within a specially enumerated exception to § 623. That exception is set out in § 626(f)(2):

> It shall not be unlawful for an employer, employment agency, or labor organization ... to observe the terms of a bona fide seniority system or any bona fide

employee benefit plan such as retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter, except that no such employee benefit plan shall excuse the failure to hire any individual.

29 U.S.C. § 623(f)(2) (1967) (emphasis added).[2] Thus, a defendant who (1) observes the terms (2) of a bona fide employee retirement plan (3) which is not a subterfuge to evade the purposes of the ADEA successfully raises a defense to a claim of unlawful age discrimination. Here, however, I find that GAF did not observe the terms of its own plan. Because I reach this determination, I need not decide whether defendant's plan is "bona fide" or whether it is a "subterfuge".

The "GAF SALARIED EMPLOYEES PENSION PLAN" is explicit in its retirement terms. At ¶ 5.1, it states,

> Normal Retirement. A Participant shall cease his employment with the Company and shall retire on the first day of the month coincident with or immediately following his 65th birthday which date shall be known as his Normal Retirement Date.

At ¶ 5.2, it states the terms for early retirement:

> Early Retirement. A Participant who has attained his 55th birthday may at his own request be retired on the first day of any month.... (emphasis added).

From these provisions it is clear that, in the normal course, an employee of GAF is automatically retired upon reaching the age of 65 but that upon reaching the age of 55 the employee has the option of taking earlier retirement. The contractual scheme makes no provision for the early retirement of

---

1. § 623(a)(1) states:
   It shall be unlawful for an employer ... to fail or refuse to hire or discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age ....

2. In 1978, § 623(f)(2) was amended, in part, to include the following language, "and no such ... employee benefit plan shall require or permit the involuntary retirement of any individual

... because of the age of such individual." If I were to apply the statute as amended, defendant could not avail itself of the defense it pleads in this case. In this instance, however, I do not apply the amendment retroactively. Rather, I will consider the law as it applied to these facts on the date of Mr. Cheng's early retirement. See, e.g., Smart v. Porter Paint Co., 630 F.2d 490, 497 (7th Cir.1980); Marshall v. Atlantic Container Line, 18 FEP Cases 1167, 1168–72 (S.D.N.Y.1978).

individuals, for reasons other than disability, *see* ¶ 5.3, *at the option of the corporation.* On similar facts, the Court of Appeals for the Seventh Circuit concluded that "in this context an employer does not observe the terms of the plan unless the plan *expressly sanctions the decision to force the employee to retire early* as well as the decision to pay him substantial benefits." *Sexton v. Beatrice Foods Co.,* 630 F.2d 478, 486 (7th Cir.1980) (emphasis added); *see also, Allen v. Colgate-Palmolive Company,* 539 F.Supp. 57 (S.D.N.Y.1981). Relief on this ground is therefore denied.

■ Defendant next complains that plaintiff failed to timely file a *complete* notice of intent to sue with the Secretary of Labor as required by § 626(d) of the ADEA. While plaintiff did file a timely notice with the Secretary by mail on December 3, 1975, it was limited to the claim that:

> I was forced by GAF Corporation of New York into *involuntary early retirement* effective July 1, 1975 because of my age, 61, rather than my technical ability/competence.

No other type of discrimination, *e.g.,* refusal to promote, was mentioned in plaintiff's notice of intent to sue. Thus, the claims of paragraphs 9, 10, 24 and 25 are dismissed to the extent they are intended to allege separate justiciable bases for relief. As stated in *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977):

> A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences.

Nor does *Shehadeh v. Chesapeake & Potomac Tel. Co.,* 595 F.2d 711, 724–25 (D.C.Cir.1978), cited by plaintiff, affect this result on the theory of a continuing violation. While *Shehadeh* applied that theory to a

number of post-termination events, the Court recognized that certain pre-termination events, albeit in a similar vein, had become "legally stale". *Shehadeh, supra,* 595 F.2d at 718.

■ Defendant next moves to dismiss plaintiff's first claim for relief on the ground that it is barred by the statute of limitations. Pursuant to § 626(e), the statute of limitations applicable to claims arising under the ADEA is set forth in § 255 of the Portal-to-Portal Pay Act, 29 U.S.C. § 251, *et seq.* That section provides a three-year limitations period for willful violations of the ADEA. Plaintiff here alleges such a willful violation and has timely filed. Defendant's motion is therefore denied.

■ Defendant next asserts that compensatory damages are not available to plaintiff pursuant to the ADEA. I agree. Although the Court of Appeals for this Circuit has not yet reached the question, five other Courts of Appeals have determined that an ADEA claimant is limited to his statutory damages under the ADEA. *Naton v. Bank of California,* 649 F.2d 691 (9th Cir.1981); *Wehr v. Burroughs Corp.,* 619 F.2d 276 (3rd Cir.1980); *Walker v. Pettit Construction Co.,* 605 F.2d 128 (4th Cir. 1979); *Vazquez v. Eastern Airlines, Inc.,* 579 F.2d 107 (1st Cir.1978); *Dean v. American Security Insurance Company,* 559 F.2d 1036 (5th Cir.1977), *cert. denied,* 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978). Moreover, the recent trend in the Southern District has been to deny compensatory relief. *See Allen v. Colgate-Palmolive Co.,* 539 F.Supp. 57, 27 Fed.Emp.Cas. 1408 (S.D. N.Y.1981); *Ayres v. Federated Department Stores,* 24 Fed.Emp.Cas. 528 (S.D.N.Y.1980); *Ginsberg v. Burlington Industries,* 500 F.Supp. 696, 24 Fed.Emp.Cas. 426 (S.D.N.Y. 1980); *contra, Pavlo v. Stiefel Laboratories, Inc.,* 22 Fed.Emp.Cas. 489 (S.D.N.Y.1979). I therefore conclude that any relief, should it be awarded, for defendant's alleged violation is limited to the statutory damages provided by § 626(b).

■ As to plaintiff's second claim for relief, defendant contends that a § 1981

claim does not lie because plaintiff has alleged only discrimination on the basis of "national origin". I reject this claim. "Section 1981 covers employment discrimination based upon race or upon what (perhaps from the point of view of the discriminator) might pragmatically be deemed as 'race'." *Budinsky v. Corning Glass Works,* 425 F.Supp. 786, 789 (W.D.Pa.1977).

■ Finally, defendant moves to dismiss plaintiff's § 1981 claim on the ground that it is governed by a one year limitations period and, therefore, is time-barred. While defendant's position is not without some support, *e.g. Theobald v. Botein, Hays, Sklar & Herzberg,* 493 F.Supp. 1 (S.D.N.Y. 1979), I feel bound by *Goss v. Revlon,* 548 F.2d 405, 406 (2d Cir.1976), states that the limitations period for § 1981 claims is three years. The motion is denied.

Defendant has separately moved pursuant to 28 U.S.C. § 1927 for its fees, expenses and costs incurred as the appellee in what it characterizes as certain "harassing and vexatious" appeals by plaintiff.

This action was filed in 1973 and plaintiff's lawyers then and now are "The Legal Service for the Elderly Poor" ("LSEP"). Also from the outset, the firm of Epstein, Becker, Borsody & Green of New York City has represented defendant GAF Corporation and has done extensive pretrial preparation obviously at substantial cost. Prior to October, 1979, one Philip Gassel was an attorney at LSEP who had, at most, peripheral participation in, but more probably, only minimal awareness of this case.

In October of 1979, Gassel left LSEP to go with the Epstein firm as an associate in its health law department. The Epstein firm, realizing the potential problem here, took steps to screen Gassel from the rest of the firm's involvement in this case, and, as I note, the Epstein health law department is separate from the litigation department handling this case. Plaintiff, however, while at no time questioning Gassel's integrity, moved to disqualify the Epstein firm from further representation of defendant on the ground of Gassel's presence among its members. This Court denied the motion

in an opinion, *Cheng v. GAF Corp.,* No. 77 Civ. 3159, (S.D.N.Y. July 1, 1981), familiarity with which is presumed. That determination was reversed by the Court of Appeals for the Second Circuit in an opinion reported at 631 F.2d 1052 and the cause remanded with the direction to enter an order of disqualification.

Defendant thereupon applied for certiorari in the Supreme Court which, while granting it, simultaneously reversed as follows, 450 U.S. 903, 101 S.Ct. 1338, 67 L.Ed.2d 327 (1981):

> On petition for writ of certiorari to the United States Court of Appeals for the Second Circuit. The petition for a writ of certiorari is granted. Judgment vacated and case remanded to the United States Court of Appeals of the Second Circuit with instructions that the appeal be dismissed. *Firestone Tire & Rubber Co. v. Risjord,* 449 U.S. 368, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981).

Upon remand to the Court of Appeals, the plaintiff applied for a writ of mandamus obviously in reliance upon footnote 13 of *Firestone, supra,* 449 U.S. at 378 n. 13, 101 S.Ct. at 676 n. 13, cited by the Supreme Court, *supra.* There the Court explains that:

> Although there may be situations in which a party will be irreparably damaged if forced to wait until final resolution of the underlying litigation before securing review of an order denying its motion to disqualify opposing counsel, it is not necessary, in order to resolve those situations, to create a general rule permitting the appeal of all such orders. In the proper circumstances, the moving party may seek sanctions short of disqualification, such as a protective order limiting counsel's ability to disclose or to act on purportedly confidential information. If additional facts in support of the motion develop in the course of the litigation, the moving party might ask the trial court to reconsider its decision. Ultimately, if dissatisfied with the result in the District Court and absolutely determined that it will be harmed irreparably,

a party may seek to have the question certified for interlocutory appellate review pursuant to 28 U.S.C. § 1292(b), . . . and, in the exceptional circumstances for which it was designed, a writ of mandamus from the court of appeals might be available.

Here, the writ was denied, the appeal dismissed, and this Court resumed jurisdiction over the case.

Thereafter, in May, 1981, plaintiff renewed his original disqualification motion in this Court although no new facts were presented.[3]  That motion was denied in July, 1981, in the following opinion:

> The motion is denied without prejudice to its later renewal should it appear that "permitting continuing representation was [in fact] prejudicial" to plaintiff. *Firestone Tire & Rubber Company v. Risjord,* 49 U.S.L.W. 4089, 4091 [449 U.S. 368, 378, 101 S.Ct. 669, 675, 66 L.Ed.2d 571] (January 13, 1981).

Plaintiff thereupon *again* sought appellate relief in the Court of Appeals for the Second Circuit by writ of mandamus.  It was denied and following the denial plaintiff applied for certiorari in the Supreme Court.  This too, was denied.

While I am not prepared to fault plaintiff for moving again before this Court, in effect requesting reconsideration, I cannot but conclude that the subsequent mandamus—which was in fact the second mandamus to the Court of Appeals on the same record—and the subsequent application for a writ of certiorari to the Supreme Court from its denial were frivolous in the extreme and "unreasonably and vexatiously" multiplied the costs to defendant in this case with no genuine chance of success.  I cannot understand why plaintiff should expect that the Court of Appeals, having denied mandamus *on the way down* from the Supreme Court should reverse itself on the way up again, and *a fortiori,* why plaintiff should think the Supreme Court, absent any showing of irreparable damage *(see, Firestone* n. 13, quoted *supra* ) would have the slightest likelihood of granting certiorari.[4]  I note that plaintiff's attorney does not suggest that he had any such expectation or likelihood in his affidavit on this motion.

Plaintiff's attorney denies any intent to multiply the proceedings and increase costs by unreasonable and vexatious appeals, and observes that plaintiff's firm is "a small public interest underfunded law office."  Nevertheless, plaintiff's attorneys *should have known* that these appeals were without hope and would have the effect of unreasonably and vexatiously increasing costs to the defendant.  I have before me bills from defendant's counsel to its client for many thousands of dollars for work that was necessitated by these appellate proceedings.

■ Given all the foregoing, the issue of appropriate relief presents a troublesome problem for the Court.  I must and do keep

---

**3.**  Plaintiff contends that United States District Court Judge Constance Baker Motley's opinion in *Yaretsky v. Blum,* 456 F.Supp. 653 (S.D.N.Y. 1978), *aff(d)* 592 F.2d 65 (2nd Cir.1979), is a new "fact" justifying not only the renewal of the motion in this Court but also the full appellate panoply as well.  The implied argument that this "fact" met any test of *Firestone* fn. 13, *supra,* is patently frivolous as is the argument that "subsequent developments in the law" (*see* Weiss affidavit of February 25, 1982) justified the appeals.  Once the Supreme Court had spoken here, that was the law of this case.

**4.**  This view is in my judgment strengthened by the following quotation from the text of *Firestone* itself:

> An order refusing to disqualify counsel plainly falls within the large class of orders that are indeed reviewable on appeal after final judgment, and not within the much smaller class of those that are not.  The propriety of the District Court's denial of a disqualification motion will often be difficult to assess until its impact on the underlying litigation may be evaluated, which is normally only after final judgment.  The decision whether to disqualify an attorney ordinarily turns on the peculiar factual situation of the case then at hand, and the order embodying such a decision will rarely, if ever, represent a final rejection of a claim of fundamental right that cannot effectively be reviewed following judgment on the merits.  In the case before us, petitioner has made no showing that its opportunity for meaningful review will perish unless immediate appeal is permitted.

in mind that LSEP is a publicly funded law firm. Still the identity of the actor is not a grant of absolution for costly conduct. With these considerations in mind, defendant is awarded $1,000 against fees, costs and expenses incurred in opposing the second mandamus in the Court of Appeals and the subsequent application for certiorari in the Supreme Court.

Except as specifically granted, all other relief sought by these motions is denied. Submit order on notice.